1   Edward Allen, Pro Se
    P.O. Box 3584
2   Seal Beach, California 90740
    Telephone: (562) 810-5317
3   Facsimile: (562) 439-4080

4   Plaintiff in Pro Se

5

6

7

8                    **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10  EDWARD ALLEN, an individual,

11          Plaintiff,                        **CASE NO.  06CV 0371 L  NLS**

12  v.                                        **[PROPOSED] PRETRIAL ORDER**

13  THE GHOULISH GALLERY, an entity of
    unknown form; TIM TURNER, an individual,   Complaint Filed:  February 16, 2006
14  APRIL TURNER, an individual, and DOES 1
    through 10, inclusive,
15
            Defendants.
16

17
    TIM TURNER, an individual, and APRIL
18  TURNER, an individual, dba THE GHOULISH
    GALLERY,
19
            Counter-Claimants,
20
21  v.

22  EDWARD ALLEN, an individual,

23          Counter-Defendant.

24

25  ///

26  ///

27  ///

28  ///

                              –1–

1    Following pretrial proceedings pursuant to Fed.R.Civ.P. 16 and Civil Local

2  Rule 16.1.f.6,

3    IT IS ORDERED:

## I.    CASE SUMMARY

**A.    Nature of the Action**

6    1.    Plaintiff Edward Allen commenced this action against the Defendants,

7  Tim Turner, an individual, dba "The Ghoulish Gallery," and April Turner, an

8  individual.  This is a civil action arising under the United States Copyright Act, 17

9  U.S.C. §§ 101, et seq. The pleadings which raise the issues are the Complaint filed by

10  the plaintiff on February 16th, 2006, which included charges of  Federal Copyright

11  Infringement;  Federal Unfair Competition – False Advertising Under § 43 (a)(1)(B);

12  Unfair Competition – California Common Law;  Unfair Business Practice – Cal. Bus.

13  & Prof. Code §§ 17200 et seq.; and Intentional Interference with Prospective

14  Economic Advantage; and Trade Libel.

15    2.    Defendants filed their Answer and Counterclaim on April 3rd, 2006,

16  alleging that the Plaintiff had engaged in False Advertising under § 43(a)(1) of the

17  Lanham Act; Untrue or Misleading Advertising - Cal. Bus. & Prof. Code § 17500;

18  Unfair Competition - California Common Law;  Intentional Interference with

19  Prospective Economic Advantage; and Trade Libel.

20    3.    On May 31st, 2007, Defendants filed an Amended Counterclaim against

21  the Plaintiff including an additional charge of Defamation.

**B.    Parties to the Action**

23    4.    Plaintiff, Edward Allen, is an individual who owns and operates the

24  business "Haunted Memories Changing Portraits."  Since its inception in April 2003,

25  Plaintiff's business has provided lenticular-based changing portraits featuring antique

26  photographic imagery that turns into frightening apparitions.  Plaintiff resides at 262

27  Wisconsin Avenue, Apt. A, in Long Beach, CA 90803.

28    5.    Defendant Tim Turner is the owner of the business "The Ghoulish

Gallery." Plaintiff alleges that April Turner is also an owner of the business. The Ghoulish Gallery makes and sells its own line of spooky, lenticular-based changing portraits from the Turners' residence, located at 2 Via Olorosa, Rancho Santa Margarita, CA, 92688.

**C.   <u>Pleading that Raised the Issues in this Action</u>**

6.     Plaintiff Edward Allen commenced this lawsuit against The Ghoulish Gallery, an entity of unknown form; Tim Turner, an individual; and April Turner, an individual (hereinafter "Defendants"), pursuant to Complaint dated February 16th, 2006, and Answer and Counterclaim of Defendants dated April 3rd, 2006, and Defendants' Amended Counterclaim dated May 31, 2007, and Plaintiff's Answer thereto dated June 18, 2007.

7.     April Turner has asked to dismiss her counterclaim against Edward Allen pursuant to Federal Rule of Civil Procedure Section 41(c), and requested that Allen stipulate to same as part of this Order. Allen has refused to do so.

## II.   JURISDICTION AND VENUE

Federal jurisdiction and venue are invoked upon the ground: this action is brought under the United States Copyright Act, 17 U.S.C. §§ 101, et seq. and thus raises a federal question. This court also has federal jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 (a) and (b). Additionally, this court also has supplemental jurisdiction over the state law claims asserted in this complaint. Plaintiff alleges that venue is proper in this judicial district under 28 U.S.C. § 1391 (b) and (c). Additionally, Plaintiff alleges that this court has personal jurisdiction over the Defendants by virtue of their transacting and doing business in both State of California and the Southern District of California, as well as in San Diego at the 2005 Comic-con event.

## III.   ADMITTED FACTS

The following facts are admitted and require no proof:

1.     This court has subject matter jurisdiction based upon 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 (a) and (b).

2.     Plaintiff Edward Allen creates and sells spooky "antique photo-based" lenticular changing portrait props through his business "Haunted Memories Changing Portraits."

3.     The domain name/URL for the "Haunted Memories" website (www.hauntedmemories.com) was purchased by the Plaintiff on April 19th, 2003.

4.     "Haunted Memories Changing Portraits" ("Haunted Memories") is a business that makes and sells lenticular changing portrait props whose subject matter is predominantly antique photographs of people.

5.     Plaintiff Edward Allen is the owner, artist, and creator of "Haunted Memories Changing Portraits."

6.     Plaintiff Edward Allen registered the url www.hauntedmemories.com on April 19th, 2003.

7.     Plaintiff Edward Allen designed and created a website for "Haunted Memories" in April 2003.

8.     Plaintiff Edward Allen is the author/creator of the webpage design, written text, changing portrait artwork, and photographs of the frame images used on the "Haunted Memories" website, located at www.hauntedmemories.com.  Among other fonts, Plaintiff has used pre-existing font styles of "Ruben," "Times New Roman," "Arial," "Rudelsberg," and several others that are in the public domain.

9.     Plaintiff Edward Allen advertises his services and products in interstate commerce, including via the internet, from his website located at www.hauntedmemories.com.

10.     Plaintiff Edward Allen has also sold his "Haunted Memories" changing portraits on the internet auction site "ebay" (www.ebay.com).

11.     Plaintiff Edward Allen registered the e-mail account hauntedmemories1969@yahoo.com on May 6th, 2003.

12.     Plaintiff filed a copyright for the design and content of the "Haunted Memories" website on or about December 13th, 2004.

13.     Plaintiff chose to write his business name "Haunted Memories" using the "Ruben" font as early as June of 2003.

14.     Plaintiff chose to write the tagline for his business using the "Rudelsberg" font as early as June of 2003.

15.     Plaintiff wrote and hosted "mini-biographies" for each of his changing portrait characters on his website as early as June of 2003.

16.     From as early as April 2005 to as late at February 1st, 2007, The Ghoulish Gallery operated out of a bank account that is in April Turner's name.

17.     At his deposition taken on February 1st, 2007, Defendant Tim Turner stated that at that time he did not have a bank account of his own, saying "Basically, I technically don't have a banking account."

18.     Defendant Tim Turner owned a website for his hypnotherapy practice, "Hypnos-ease," as late as June 2004.

19.     The url for Tim Turner's "Hypnos-ease" website was www.hypnosease.com.

20.     Defendant Tim Turner registered a Yahoo e-mail account "hypnosease@yahoo.com" on May 28th, 2003.

21.     Defendant Tim Turner was aware of the Haunted Memories website as early as July 29th, 2004.

22.     Defendant Tim Turner e-mailed Plaintiff on July 29th, 2004, inquiring about the prices of Plaintiff's Haunted Memories Changing Portraits.

23.     Defendant Tim Turner stated to Plaintiff "We've always wanted to do a changing portrait type effect but just couldn't figure out how to do it."

24.     Defendant Tim Turner repeatedly referred to the lenticular term "LPI"

–5–

1   ("lenticules per inch") as "LDI."

2        25.    In his follow up e-mail sent on July 31st, 2004, Defendant Tim Turner

3 asked Plaintiff which of his changing portrait characters were "the most

4 popular/effective?"

5        26.    In August 2004, Defendant Tim Turner auctioned an antique photograph

6 of a bride on ebay, stating "Now I'll be honest and say I don't know a heck of a lot

7 about old photos…"

8        27.    Defendant Tim Turner registered the url www.theghoulishgallery on

9 September 13th, 2004.

10        28.    Defendant Tim Turner registered a Yahoo e-mail account for "The

11 Ghoulish Gallery" ("theghoulishgallery@yahoo.com") on September 13th, 2004.

12        29.    Tim Turner's ebay account was called "reelcreations" in 2004.

13        30.    Initially, Defendant Tim Turner did not show his characters displayed

14 inside antique frame images on his website www.theghoulishgallery.com

15        31.    Initially, none of Defendant Tim Turner's changing portrait characters

16 features the black oval matting effect.

17        32.    The October 10th, 2004 ebay auction for the changing portrait character

18 "Isabella" shows that initally Tim Turner did not design the character art with the

19 black oval matting effect.

20        33.    The feather-edged black oval matting effect in Plaintiff Edward Allen's

21 changing portraits is not part of the original cabinet cards, but rather a construct

22 created by the Plaintiff using the Photoshop program.

23        34.    As of July 2003, five out of nine of Edward Allen's changing portrait

24 characters featured the feather-edged black oval matting effect which he added in.

25        35.    Defendant Tim Turner has admitted that from 1996 to 2002 he was not

26 engaged in the creation, production, or marketing of lenticular changing portraits.

27        36.    Defendant Tim Turner admits that he worked as a "Production

28 Assistant" on the Addams Family film in 1991.

37.     Defendant Tim Turner has admitted that the two receipts from the "House of Humor" were written in his own hand.

38.     Defendant Tim Turner re-named his ebay account "hypnosease" on June 19th, 2003.

39.     Defendant Tim Turner re-named his ebay account "reelcreations" on June 21st, 2004.

40.     In January 2005, the Ghoulish Gallery website had a section titled "About the Owner," which stated "The Ghoulish Gallery has been my baby for the last 13 years or so, and I've built its spooky collection from one portrait in 1991 to its present -- and still growing -- collection of delightfully creepy characters."

41.     Defendant Tim Turner has admitted that his "team" consisted of Larry Carr, Ron Pardini, Brandon Champlin, Steve Cotroneo, and himself.

42.     Defendant Tim Turner has admitted at his February 2007 deposition that he is not the owner of any registered copyrights.

43.     On November 7th, 2004, Defendant Tim Turner was asked by Plaintiff to stop using the "charcoal frame" jpeg image on www.theghoulishgallery.com which Plaintiff maintained was his creation.

44.     Defendant Tim Turner did not respond to Plaintiff's November 7th e-mail request and proceeded to add the "charcoal frame" jpeg image to even more of his characters.

45.     Plaintiff hired a lawyer named Lisa Cervantes to send Defendant Tim Turner a "cease and desist" letter ordering him to stop using Plaintiff's "charcoal frame" jpeg image.

46.     Tim Turner creates and sells spooky "antique photo-based" lenticular changing portrait props through his business "The Ghoulish Gallery."

47.     The website for Tim Turner's changing portrait business is www.theghoulishgallery.com.

48.     Edward Allen purchased the domain www.ghoulishgallery.com in the spring

1  of 2005.

2      49.    Edward Allen is currently employed by the Bay Theater in Seal Beach,

3  California and has been employed there from 1991 to 1998 and from 2002 to the

4  present.

5      50.    The changing portraits of both Plaintiff Edward Allen and Defendant

6  Tim Turner were inspired by Disney's Haunted Mansion.

7      51.    The following websites and/or companies all sell spooky changing

8  portraits: www.hauntedmemories.com, www.theghoulishgallery.com,

9  www.hauntedportraits.com, www.grimsgallery.com, Morbid Industries (Goretraits) and

10 Ruby's.

11     52.    Anyone can advertise or display their Antique Photo-style Changing

12 Portrait on the internet.

13     53.    Anyone can go into the business of creating and producing Antique

14 Photo-Style Changing Portraits.

15     54.    Tim Turner can display his Antique Photo-style Changing Portraits

16 using any mat.

17     55.    Tim Turner is entitled to sell changing portraits.

18     56.    Edward Allen promoted his products as "original works."

19     57.    Edward Allen posted on the Haunted Attraction Message Board that he

20 is the "originator" of the Antique Photo-style Changing Portraits.

21     58.    Edward Allen did not invent changing portraits.

22     59.    The concept of a changing portrait is more than a century old.

23     60.    Universal Framing made a wooden frame, a photograph of which

24 Edward Allen claims to have copyrighted.

25     61.    Edward Allen purchased the frame stock that he photographed from

26 Universal Framing.

27     62.    Edward Allen has no complaint about Tim Turner displaying his

28 changing portraits in a before and after format, so displaying the portraits in before

–8–

1   and after format is not at issue in this action.

2       63.   Neither Edward Allen nor Tim Turner copied an exact portrait that the

3   other had made.

4       64.   Defendants have not created an Antique Photo-Style Changing Portrait

5   based on any photograph which is copyrighted by Edward Allen.

6       65.   Tim Turner has never sold the same changing portrait as Edward Allen.

7       66.   There is buyer confusion between the Haunted Memories website and

8   the Haunted Portraits website, even though Haunted Portraits uses a different font

9   and different frames.

10       67.   Edward Allen contacted Ken Connelly and asked him whether he wrote

11   the feedback that was attributed to him on Turner's website.

12       68.   Allen contacted Brandon Champlin by email to question him about

13   feedback Champlin left on Turner's website.

14       69.   In that email to Champlin, Allen stated that a lot of Turner's artwork

15   was "unrealistic" and "definitely not the best out there."

16       70.   Allen contacted Carrie Vines by email and telephone regarding her

17   feedback on Tim Turner's website.

18       71.   Allen asked Carrie Vines to take her quote off of Turner's website and

19   stated that he wouldn't want to have this get legal, because she was misrepresenting

20   what was happening.

21

22       72.   Allen emailed Scott Broad of Haunted Media Magazine after learning

23   that Turner had done an interview with the magazine and told Mr. Broad that Turner

24   was falsely telling people that Turner was the first to develop the changing portraits

25   and that Allen copied Turner.

26       73.   A portion of Allen's website states or stated as follows:  "ACCEPT NO

27   SUBSTITUTES!  Beware of confusingly similar products that try to imitate my style

28   and web design.  Haunted Memories is the PREMIERE changing portrait website."

**PRETRIAL ORDER**                                   06CV 0371 L NLS

74.    On his website, Allen referred to his competition as "unabashed a\*\*holes."

75.    On his website, Allen stated that his competition had "been talking trash about me to people they meet" and that the rumor they were spreading was that Allen was not a nice guy.

76.    On his website, Allen stated that he does not think that the work of his competitors is very good.

77.    Edward Allen had quotes in the feedback section of his website that were "digs" at the other companies.

78.    On his Haunted Memories website, Edward Allen posted correspondence from an alleged customer regarding products similar to Edward Allen's, but "not the same quality," and included the following editorial beneath it: "(Eddie's Note:  This fellow is referring to the work of "Dim Turder" – name withheld to protect the mediocre.  Yes, that is my opinion and I'm entitled to have it. If you are a member of the "Nice Police," and you think I'm being "negative," kindly piss off until you know all the facts.  If you knew the real story you'd be disgusted, too.  Needless to say, I do not endorse the "Fhoulish Fallacy" in any way and they are not affiliated with me or my site)."

79.    On his Haunted Memories website, Edward Allen made fun of Tim Turner's name and the name of Turner's company and said that Turner was a mediocre artist.

80.    On June 22, 2005, Allen posted a message on the Haunted Attractions message board that Turner should "slash" his prices, because another company was coming out with changing portraits.  The message went on to say as follows:  "Yes, the Gortraits will probably hurt my business, but I don't care.  I've had a good run these past two years as the ORIGINATOR of Spooky Changing Portraits based on

1   antique photo images.  The copycats can now fight it out amongst themselves."

2   81.   Leonard Pickle, the owner of the Haunted Attractions message board

3   removed Mr. Allen's June 22, 2005 posting from the website.

4   82.   Tim Turner created and posted on his website a spooky changing

5   portrait of the Mona Lisa turning into a skeleton in sepia tone.

6   83.   A couple of months after Turner had created a spooky changing portrait

7   of the Mona Lisa, Allen created a spooky changing portrait of the Mona Lisa turning

8   into a vampire in full color.

9   84.   On his website, Allen stated the following:  "Compare my spooky Mona

10   Lisa with the other "ghoulish" versions out there and decide for yourself whose

11   portraits are truly 'unsurpassed in artistic detail and quality.'  (Notice the quotation

12   marks around their bragging, but inaccurate quote, which he tries to say that I

13   misappropriated.  I did not "borrow" anything from this imitator – my putting it in

14   quotations shows that I am not saying it myself.  (Duh!)"

15   85.   Tim Turner created and posted on his website a spooky changing

16   portrait based on Napoleon on Horseback.

17   86.   After Turner created a changing portrait based on Napoleon on

18   horseback, Allen stated on website that he will be doing his own portrait of Napoleon

19   on horseback and that "[Allen's] will be better than [Turner's] as usual!"

20   87.   Turner created and posted on his website a spooky changing portrait of a

21   pirate that he named "Dead Men Tell No Tales."

22   88.   After Turner created a changing portrait of a pirate named "Dead Men

23   Tell No Tales," Allen created a changing portrait of a pirate named "Tell No Tales."

24   89.   After Tim Turner did a portrait of Leonard Pickle, Edward Allen

25   volunteered to do one of Mr. Pickle as well.

26   90.   On his website, Allen stated that he did not have a refund policy for his

27   portraits, because he believed "his competitors would place false orders and take

28   advantage of it."

91.   The "Ruben" or "Haunted Mansion" font is commonly used in the haunt industry.

92.   Edward Allen is not the author of the "Ruben" font.

93.   The "Ruben" font was not custom-designed for Edward Allen.

94.   Edward Allen is not the author of the "Rudelsberg" font.

95.   The "Rudelsberg" font was not custom-designed for Edward Allen.

96.   Another competitor, Haunted Portraits, uses the Ruben font on its website.

97.   The font styles used by Mr. Turner are in the public domain.

98.   Edward Allen participated in one trade convention in 2003.

99.   Edward Allen did not participate in any trade conventions in 2004.

100.   Edward Allen participated in two trade conventions in 2005.

101.   Edward Allen participated in at least five trade conventions in 2006, not including the Haunt X Convention.

102.   Edward Allen attended one haunt convention.

103.   Both Allen and Turner appeared at three of the same conventions in 2006, not including the Haunt X Convention.

104.   Edward Allen advertises his portraits as the "most photorealistic artwork and best-executed transitions available."

105.   Edward Allen claims that Haunted Memories is "highly regarded in the industry as, not only the originator of changing portraits, but possessing the highest quality of imagery."

106.   Edward Allen and Brandon Champlin had a history of antagonism that was independent of Turner and predated the creation of the Ghoulish Gallery website.

107.   Edward Allen does not claim that he was the only changing portrait company that could advertise in the Haunted Attraction magazine.

108.   Edward Allen altered certain quotes on his website.

109.   If a quote is altered for the sake of brevity and it doesn't materially

1  change the meaning of the quote, then Edward Allen does not have a problem with
2  the fact that it was changed.

3      110.   Edward Allen posted a comment on the Haunted Attractions message
4  board that Tim Turner had changed feedback to delete the words "some of " from a
5  quote.

6      111.   J. Hart responded to Mr. Allen's post and claimed that Mr. Allen makes
7  "a general practice of calling [his] competitors belittling names, running down their
8  products, then using another person's copyrighted work, without their permission, in
9  a childish attempt to make fun of a competitor."

10     112.   Mr. Allen responded to Mr. Hart and told him that if he didn't shut his
11  mouth, he was going to answer for it in court.

12     113.   Edward Allen contacted Frank Weidman regarding a message that Mr.
13  Weidman posted on the Haunted Attractions message board that was in support of
14  Tim Turner and negative towards Edward Allen.

15     114.   In an October 11, 2004 email to Brandon Champlin, Edward Allen
16  stated that he does "not dispute the assertion that Tim made a changing portrait
17  before I did."

18     115.   Edward Allen sent to Larry Kirchner a portion of an email thread
19  between himself and Tim Turner.

20     116.   During the second session of his deposition, in response to a question as
21  to whether Edward Allen had disseminated a document he created entitled "The
22  Ghoulish Gallery's Infringing Advertisements," Mr. Allen stated that he had not, but
23  that he "may at some point have a need to tell people what went on because a lot of
24  people don't understand the facts."

25     117.   At deposition, Edward Allen testified that he "may send [an email from
26  Tim Turner to Edward Allen] to more people when this thing's over."

27     118.   Prior to Edward Allen's filing of this lawsuit, Tim Turner offered
28  several times to discuss Allen's issues with Turner over the telephone in an attempt

1    to resolve their differences, and Allen did not want to do this over the telephone.

2      119.   John Landis provided feedback on the Haunted Memories website after

3    being given a portrait by Edward Allen.

4      120.   In February of 2006, Defendant Tim Turner was a co-sponsor of a haunt

5    industry tradeshow that took place at the LAX Hilton.

6      121.   Although Edward Allen did not purchase a table at the February 2006

7    Haunt X tradeshow, he rented a conference room at the LAX Hilton on the same

8    weekend as Haunt X and placed signs and an agent in the lobby of the hotel to alert

9    people about his exhibit, which was located upstairs.

10      122.   During the 2006 Haunt X Convention, Plaintiff Edward Allen packed up

11    his exhibition and left the LAX Hilton voluntarily.

12      123.   On or about May 16, 2007, Edward Allen filed another lawsuit in the

13    Superior Court of Los Angeles against Tim Turner and three others alleging slander,

14    defamation, conspiracy to defame, libel, trade libel, intentional interference with

15    prospective economic advantage, negligent interference with prospective economic

16    advantage and invasion of privacy (false light) in connection with the Haunt X

17    convention in Los Angeles in 2006.

18      124.   On November 10, 2005, Edward Allen posted the following comments

19    on the Haunted Attraction message board:  that he got "RIPPED OFF by the other

20    changing portrait companies" and that he has been "STOLEN FROM and LIED

21    ABOUT and I am going to SUE over it – AND I WILL WIN!"

22      125.   Edward Allen has a yahoo email account under the name "John Landau"

23    and admits that he and his cousin have used that name as an alias.

24      126.   In an attempted "sting to see what Mr. Turner would say to potentially

25    confused customers," Edward Allen had his cousin, Bill Mauerhan, email Mr. Turner

26    and inaccurately claim that he had enjoyed Turner's exhibit at a convention, when it

27    was actually Mr. Allen's exhibit.

28      127.   Edward Allen had his cousin, Bill Mauerhan, pose as a customer for the

Ghoulish Gallery, so that Mr. Allen could get a cancelled check back from the Ghoulish Gallery and determine whether Mr. Turner would say anything negative about Mr. Allen when Mr. Mauerhan inaccurately claimed that he had enjoyed Turner's exhibit at a convention, when it was actually Mr. Allen's exhibit.

128.   Edward Allen advertised on his Haunted Memories website that Haunted Memories Changing Portraits "was the first to take antique photographs, create scary transforming images, and offer them as a successful line of products. NOBODY was in this business selling this particular product before I was.  I can PROVE IT with facts, not with hot air!  I would never make this claim if it were not true!"

129.   In October 2006, and in response to a posting by Tim Turner that attempts to distinguish his products from those of Edward Allen, Allen posted a quote from an article entitled "Competition Freaks," which stated that "hypercompetitiveness resembles a diagnosable mental disorder – a volatile alchemy of obsessive compulsiveness, narcissism, neurosis and sometimes a dose of paranoia."

## IV.   RESERVATION AS TO ADMITTED FACTS

The reservations as to the facts recited in paragraph III above are as follows: Both Plaintiff and Defendants reserve the right to object to any of the admitted facts on grounds of relevance or Federal Rule of Evidence 403.

## V.   NON-CONTESTED, BUT NOT ADMITTED FACTS

The following facts, though not admitted, are not to be contested at the trial by evidence to the contrary:

1.   Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## VI.   CONTESTED FACTS

The following issues of fact, and no others, remain to be litigated upon the

1 trial:

2 **Plaintiff's Contested Facts:**

3 **General**

4     1.          Using html coding, text, and jpeg imagery, Plaintiff

5 designed and built a website for his "Haunted Memories" changing portraits in May

6 2003.

7     2.          Plaintiff first displayed his changing portraits publicly at

8 the "Fangoria" Weekend of Horrors Event in Burbank, California on the weekend of

9 May 24th and 25th, 2003.

10     3.          Defendant Tim Turner registered the e-mail

11 hypnosease@yahoo.com on May 8th, 2003.

12     4.          Defendant Tim Turner registered an ebay account under the

13 user name "harrybuttcheekian" on April 28th, 2003.

14     5.          Defendant Tim Turner re-named his ebay account

15 "hypnosease" on June 19th, 2003.

16     6.          Defendant Tim Turner re-named his ebay account

17 "reelcreations" on June 21st, 2004.

18     7.          Defendant Tim Turner created a new ebay account with the

19 username "tgg1995" on November 29th, 2005.

20     8.          Defendant Tim Turner built a website for "The Ghoulish

21 Gallery" using the assistance of his webmaster Brandon Champlin.

22     9.          In his "About the Owner" page on

23 www.theghoulishgallery.com, Turner wrote "For over 24 years, I've been making

24 monsters for movies."

25     10.          In October 2004, the Ghoulish Gallery website stated "The

26 secret to The Ghoulish Gallery's consistently superior product is a small, close-knit

27 team made up of such monster/character experts as Hollywood special effects people

28 and even a few former Walt Disney Imagineers."

11.          Defendant Tim Turner has admitted that his "team" consisted of Larry Carr, Ron Pardini, Brandon Champlin, Steve Cotroneo, and himself.

12.          Defendant Tim Turner has stated under oath at his deposition "I was never a Disney Imagineer."

13.          Brandon Champlin is not a Disney Imagineer.

14.          In October 2004, "The Ghoulish Gallery" website featured a stated copyright claim of "Copyright 1991" at the bottom of its various pages.

15.          In October 2004, "The Ghoulish Gallery" website also featured a section titled "Copyright Information," which stated: "The Ghoulish Gallery website is protected by U.S. and International copyright laws. Pursuant to Titles 17 of the United States Code, the author or original visually perceivable work validly provides notice of a copyright by placing the "AF," "Ó" or the word "copyright" in a conspicuous location followed by the first year of publication and text identifying the name of the owner of the copyright. "

16.          Has Defendant April Turner actually accepted check and/or money order payments in her name for "The Ghoulish Gallery's" products?

17.          Is April Turner co-owner of "The Ghoulish Gallery"?

18.          Does April Turner share in the profits of "The Ghoulish Gallery" enterprise?

19.          Does April Turner work to further the success of the "The Ghoulish Gallery?"

20.          April Turner is listed as the business manager on the "Staff" page of the "Ghoulish Gallery" website.

21.          Defendant Tim Turner's website also stated that "The Ghoulish Gallery" was "a family run business."

22.          The Defendant Tim Turner "consulted with a professional

1  at Eastman Kodak so that he could see his changing portrait concept to fruition?"

2     23.          The Defendant Tim Turner "dedicated copious amounts of

3  time and research into lenticular technology and discovered that Eastman Kodak was,

4  at the time the leader in this unique art form?"

5     24.          Eastman Kodak was not able to produce lenticular images

6  until 1996-1997.

7     25.          Did Eastman Kodak produce at no cost to Defendant Tim

8  Turner 125-150 lenticular changing portraits between the years 1992-1995?

9     26.          Did Eastman Kodak make lenticular changing portraits

10  from 1992-1995?

11     27.          Defendant Tim Turner debuted the first prototype of his

12  "antique photo-based changing portrait as part of the decor for a haunted house" he

13  "designed and built for the Downtown Long Beach Business Association in 1992."

14     28.          Did Defendant Tim Turner really have any lenticular

15  changing portraits inside the Haunted House maze he designed and built for the

16  Downtown Long Beach Business Association?

17     29.          Did Eastman Kodak actually produce Defendant Tim

18  Turner's first lenticular changing portrait?

19     30.          Did Kodak provide "125 to 150" lenticular changing

20  portraits to Defendant Tim Turner free of charge?

21     31.          Plaintiff is the author/creator of the webpage design, text,

22  and visual content of the "Haunted Memories" website, located at

23  www.hauntedmemories.com

24     32.          Plaintiff designed a spooky eyeball pattern to use as his

25  website's background in May 2003.

26     33.          Defendants Tim and April Turner advertise their services

27  and products in interstate commerce, including via the internet, from their website

28  located at www.theghoulishgallery.com.

34.              Defendants Tim and April Turner have co-mingled their funds into one bank account listed under April Turner's name.

35.              On August 11th, 2004, Defendant Tim Turner auctioned a Haunted Mansion mug and misspelled the word "ghoulish" as "goulish."

36.              Defendant Tim Turner ran his first ebay auction for one of his changing portraits on October 1st, 2004.

37.              Defendant Tim Turner has admitted that the Haunted House maze he designed and built for the Downtown Long Beach Business Association happened for only "one season" in October 1990.

38.              On or about October 29th, 2004, Defendant Tim Turner began display the characters on his website in a jpeg image of a charcoal frame that was substantially similar to the one that plaintiff had been using on his website and in his ebay ads since 2003.

39.              Defendant Tim Turner contacted the manufacturer of the framestock, Dave Unger at Universal Framing, seeking to license the image with them exclusively.

40.              Defendant Tim Turner eventually complied with Plaintiff's "Cease and Desist" order regarding the "charcoal frame" jpeg image.

**A.     Copyright Infringement of Plaintiff's website for "Haunted Memories Changing Portraits. (Count I)**

41.              That Plaintiff holds and maintains exclusive right and title to the copyright and corresponding U.S. Copyright Registration for the "Haunted Memories Changing Portraits" website, located at www.hauntedmemories.com:

a.     *Haunted Memories Changing Portraits Website* -
        U.S. Copyright Registration N, TX 6-092-441

(Reg. Date: December 13, 2004)

42.          The "Haunted Memories Changing Portraits" website, located at www.hauntedmemories.com was and is used by Plaintiff to advertise his products and services.

43.          Whether Defendants have violated Plaintiff's copyright when designing and maintaining the look of their website.

44.          The Plaintiff began using the "Little" designation on child characters for his website in May 2003.

45.          The Plaintiff began using mini-biographies for every character on his website in May 2003.

46.          The Plaintiff purchased a brown frame at Aaron Brothers, took photographs, converted them to jpegs, and used them to display characters on his website "Haunted Memories" in May 2003.

47.          Whether the Defendants engaged in copyright violation in April 2005, by the use of brown frame image on their website "The Ghoulish Gallery."

48.          The Plaintiff began using the "Haunted Memories" new "Buy it Now" buttons in March 2005.

49.          Whether the Defendants engaged in copyright violation in April 2005, by the use of "Buy it Now" buttons on their website "The Ghoulish Gallery."

50.          The Plaintiff began the using charcoal frame jpeg image on his website in July 2003.

51.          Plaintiff took photographs of a custom assembled frame made from the Universal Framing stock, converted it to a jpeg image, and used it to display several characters on the "Haunted Memories" website.

52.          Whether the Defendants took their own photograph of the

-20-

1   "charcoal frame" or obtained it from the Plaintiff's website.

2       53.         Whether the Defendants engaged in copyright violation in

3   October 2004, by the use of the same charcoal frame image on their website "The

4   Ghoulish Gallery."

5       54.         Did the Defendants create a competing website for their

6   product after seeing the "Haunted Memories" website and did it incorporate designs

7   and content from Plaintiff's website?

8       55.         Plaintiff ran his first magazine advertisement for his

9   "Haunted Memories Changing Portraits" in Issue # 34 of "Haunted Attraction"

10  Magazine in August 2003.

11      56.         Why did the Defendants change their original February

12  2005 flyer design when they created a second version in June of 2005?

13      57.         Did the Defendants' second flyer appear substantially

14  similar to Plaintiff's magazine advertisments?

15

16      58.         Were the Defendants attempting to create buyer confusion

17  by creating a substantially similar flyer to that of the Plaintiff's magazine ads?

18      59.         Did the Defendants' close copying of Plaintiff's pre-

19  existing advertising designs constitute copyright infringement?

20      60.         If the evidence shows that Defendants infringed upon the

21  Plaintiff's copyright for his "Haunted Memories" website, is the Plaintiff entitled to

22  an injunction restraining Defendants, their distributors, officers, agents and

23  employees, and all persons acting in concert with them, from engaging in further

24  such acts in violation of the copyright laws?

25      61.         What damages are Plaintiff entitled to if Defendants

26  infringed the "Haunted Memories" website's copyright protected designs and

27  content?

28      62.         What is the amount of statutory damages to be awarded to

Plaintiff for the Defendants' copyright infringement of Plaintiff's website for "Haunted Memories Changing Portraits?

63.         The amount of attorney's fees if any, to be awarded to Plaintiff for Defendants' copyright infringement of Plaintiff's "Haunted Memories" website.

**B.    Federal Unfair Competition - False Advertising Under § 43 (a) (1) (b) (COUNT II)**

64.         Whether or not Plaintiff was the first to create and market a line of lenticular changing portraits based on antique photographic imagery.

65.         Whether the Plaintiff took reasonable measures to protect his business by filing a trademark, registering copyrights, etc.

66.         In October 2004, did the Defendants falsely state that they had been doing business as "The Ghoulish Gallery" "Since 1992"?

67.         In April 2005, did the Defendants falsely state that they had been doing business as "The Ghoulish Gallery" "Since 1995"?

68.         Did the Defendants falsely state that the "The Ghoulish Gallery" website was "copyrighted since 1991"?

69.         Defendant Tim Turner admitted at his February 2007 deposition that he is not the owner any registered trademarks for "The Ghoulish Gallery."

70.         Did the Defendants falsely imply that they had trademarked the term "Changing Portraits" by placing a "TM" after the words "Changing Portraits" on their website?

71.         Did the Defendant Tim Turner falsely state that he had "created antique style changing portraits in the early 1990's?"

72.         Did the Defendants falsely state that they employed a "team of artists" that included "a few former Disney Imagineers"?

73.	Did the Defendant Tim Turner later state that all artwork was created by himself?

74.	Did Defendant Tim Turner have "over 24 years experience" doing special effects work for Hollywood?

75.	Does Defendant Tim Turner's IMDb profile only account for eight years of experience?

76.	Did the Defendant Tim Turner state that he had worked for "some of the biggest dark films in history?"

77.	Did Defendant Tim Turner state that he is a "veteran Hollywood effects artist?"

78.	Did the "Ghoulish Gallery" website instruct visitors to visit the IMDb website in order to view the purported film resume of Defendant Tim Turner?

79.	Did Defendant inflate his IMDb profile to include positions held and/or titles of films that he did not actually work on?

80.	Did Defendant Tim Turner host a fabricated and/or embellished resume on his IMDb profile?

81.	Did Defendant inflate his IMDb profile to include positions held and/or titles of films that he did not actually work on?

82.	Did the Defendant Tim Turner contribute "Special Makeup Effects" to the "Addams Family" movie?

83.	Did Defendant Tim Turner publish false and/or misleading statements on his "The Ghoulish Gallery" website when he stated that he had made changing portraits for inclusion in "The Addams Family" movie in 1991?

84.	Did Defendant Tim Turner publish false and/or misleading statements in at least one Ebay advertisement indicating that he had made changing portraits for inclusion in "The Addams Family" movie in 1991?

85.	Did Defendant Tim Turner falsely state that "while working

-23-

1  on the Addam's Family in 1990-1991," he "overheard a discussion concerning a

2  proposed effect that was dropped from the film and saw the potential for a home

3  consumer version of a changing portrait that could be created from old victorian

4  photos?"

5      86.                    Was Defendant Tim Turner hired by Alterian Studios in the

6  early 1990's to work in the capacity of production assistant?

7      87.                    Did the Defendants falsely state on their website "The

8  Ghoulish Gallery" that they "get over half a million unique visitors each year?"

9      88.                    Did the Defendant Tim Turner falsely state that he had been

10 employed as a Disney Imagineer?

11     89.                    Is it true that Leonard Pickel "asked" Tim Turner to create

12 his own custom portrait?

13     90.                    Did the Defendants' website feature a review of their

14 products and services written by Brandon Champlin?

15     91.                    Did the Defendants knowingly publish <u>altered</u> feedback

16 quotes on their website "The Ghoulish Gallery?"

17

18     92.                    Did the Defendants knowingly publish <u>fabricated</u> feedback

19 quotes on their website "The Ghoulish Gallery?"

20     93.                    Whether Defendant Tim Turner engaged in the unfair

21 business practice of fabricating positive customer testimonials about his products.

22     94.                    Whether Defendant Tim Turner engaged in the unfair

23 business practice of fabricating negative customer testimonials about Plaintiff's

24 products.

25     95.                    `Did the Defendants fabricate the customer feedback

26 comment attributed on their website to "Erin and Colm"?

27     96.                    Did the Defendants the customer feedback comment

28 attributed on their website to "Brad Pitt and Jennifer Aniston"?

97.          Did the Defendants fabricate the customer feedback comment attributed on their website to "Clifford (January 2005), Cliff (May 2005) or John in Long Beach (October 2005)?

98.          Did the Defendants fabricate the customer feedback comment attributed on their website to "Carrie V - Former Haunted Memories Customer"?

99.          Why does the e-mail sent by Carrie Vines to the Plaintiff on April 28th, 2005 bear the same IP address as Tim Turner's e-mail from October 19th, 2004?

100.          Did the Defendants fabricate and/or alter the customer feedback comment attributed on their website to from "Mark & Diana"?

101.          Did the Defendants fabricate and/or alter the customer feedback comment attributed on their website to "John in Canada"?

102.          Did Ken Conley of Microlens write the positive feedback statement about Tim Turner on Defendants' website?

103.          Was the "Haunt X Best New Product Award for 2005" only available to vendors attending the "Haunt X" convention in 2005?

104.          Are the "Haunt X" awards considered "National Awards?"

105.          What constitutes a National Award?

106.          Are businesses that are not vendors at the "Haunt X" event eligible to receive the award?

## C.     Unfair Competition - California Common Law  (COUNT III)

107.          In his e-mail dated October 19th, 2004, Defendant Tim Turner told Plaintiff "I don't give a crap if you felt your reputation was smeared."

108.          In his e-mail dated October 19th, 2004, Defendant Tim Turner told Plaintiff "I'm about to launch a counter offensive that will, in all likelihood, ruin you."

109.          Whether Defendants have created buyer confusion between their site and Plaintiff's by designing and maintaining a website that features the use of similar frames, font styles, color scheme, black oval matting, and mini-biographies for their characters.

110.          Whether the Defendants have substantially copied the design of Plaintiff's magazine advertising.

111.          What was the basis for Defendants' claiming "Copyright 1991" on "The Ghoulish Gallery" website?

112.          Did the Defendants put "Copyright 1991" on their website to create the false impression that "The Ghoulish Gallery" predated "Haunted Memories?"

113.          Did the Defendants falsify the inception date(s) of their business ?

114.          Did the Defendants change the start of their business from "Since 1992" to "since 1995?"

115.          What specifically does the "Copyright 1995" claim on Tim Turner's Ghoulish Gallery website refer to?

116.          Whether Defendants engaged in the unfair business practice of creating buyer confusion by choosing the same font style of "Ruben" for their company name, as Plaintiff had already done.

117.          Did the Defendants use Plaintiff's business name "Haunted Memories" in their website metatags in an attempt to divert internet traffic from Plaintiff's site to their own?

118.          Does a preponderance of the evidence in this case show that the Defendants repeatedly engaged in acts of Unfair Competition to the detriment of the Plaintiff?

119.          In the event that Defendants are found to have engaged in Unfair Competition under California Common law is the Plaintiff entitled to

1    damages?

2         120.              What is the amount of damages, if any, that Plaintiff is
3    entitled to as a result of Defendants' engaging in Unfair Competition under
4    California Common law?

5         121.              What is the amount of attorney's fees that Plaintiff is
6    entitled to as a result of Defendants' engaging in Unfair Competition under
7    California Common law?

8         122.              If the evidence proves that the conduct of the defendants
9    was intentional and willful, is the Plaintiff entitled to punitive damages?

10

11   **D.    Unfair Business Practice - California Bus. & Prof. Code §§ 17200 et seq.**
12   **(COUNT IV)**

13        123.              The Plaintiff began using the Ruben font for the title name
14   "Haunted Memories Changing Portraits" on his website in May 2003.  The
15   Defendants chose to use the "Ruben" font for their company name in October 2005.

16        124.              In his e-mail dated October 19th, 2004, Defendant Tim
17   Turner told Plaintiff "I don't give a crap if you felt your reputation was smeared."

18        125.              In his e-mail dated October 19th, 2004, Defendant Tim
19   Turner told Plaintiff "I'm about to launch a counter offensive that will, in all
20   likelihood, ruin you."

21        126.              Did Defendants chose to write the name "The Ghoulish
22   Gallery" using the "Ruben" font in an attempt to create buyer confusion between
23   their products and the Plaintiff's?

24        127.              The Plaintiff began using a spooky eyeball background for
25   his website in May 2003.

26        128.              Whether the Defendants engaged in buyer confusion in
27   October 2004, by the use of a similar spooky eyeball background on their website
28   "The Ghoulish Gallery."

129.         The Plaintiff began using black oval matting on various character pictures for his website in May 2003.

130.         Whether the Defendants attempted to create buyer confusion in October 2004 by the use of the black oval matting on their website "The Ghoulish Gallery."

131.         The Plaintiff began using the "Little" designation on child characters for his website in May 2003.

132.         Whether the Defendants attempted to create buyer confusion in October 2004, by the use of the "Little" designation on their website "The Ghoulish Gallery."

133.         The Plaintiff began using mini-biographies for every character on his website in May 2003.

134.         Whether the Defendants attempted to create buyer confusion in October 2004, by the use of the mini-biographies on their website "The Ghoulish Gallery."

135.         Whether the Defendants attempted to create buyer confusion in April 2005, by the use of the same brown frame image on their website "The Ghoulish Gallery."

136.         Whether the Plaintiff began using the disputed "Buy it Now" button design on his website in March 2005.

137.         Whether the Defendants began using a similar "Buy it Now" button design on their website in April 2005.

138.         The Plaintiff began using charcoal frames for certain characters on his website in July 2003.

139.         Whether the Defendants took their own photograph of the "charcoal frame" or obtained it unlawfully from the Plaintiff's website.

140.         Whether the Defendants engaged in buyer confusion in October 2004, by the use of the same charcoal frame image on their website "The

1  Ghoulish Gallery."

2  141.        Whether the Defendants unlawfully used Plaintiff's

3  business name "Haunted Memories" in their website metatags to divert internet

4  traffic from Plaintiff's site to their own.

5  142.        Did the Defendants knowingly publish a biased review of

6  their products and services written by their own employee, Brandon Champlin?

7  143.        Did the Defendants state that Brandon Champlin was an

8  objective "Halloween Expert" rather than an employee and contributing artist of "The

9  Ghoulish Gallery?"

10  144.        Did the Defendants knowingly publish altered feedback

11  quotes on their website "The Ghoulish Gallery?"

12  145.        Did the Defendants knowingly publish fabricated feedback

13  quotes on their website "The Ghoulish Gallery?"

14  146.        Whether Defendant Tim Turner engaged in the unfair

15  business practice of fabricating positive customer testimonials about his own

16  "Ghoulish Gallery" products and customer service.

17  147.        Whether Defendant Tim Turner engaged in the unfair

18  business practice of fabricating negative customer testimonials about Plaintiff's

19  "Haunted Memories" products and services.

20  148.        Whether Defendant Tim Turner created the postings

21  attributed to "Mary Sinclair" on the Haunted Attraction message board.

22  149.        In the event that Defendants are found to have engaged in

23  Unfair Business Practices in violation of California Bus. & Prof. Code §§ 17200 et

24  seq. is the Plaintiff entitled to damages?

25  150.        What is the amount of damages, if any, that Plaintiff is

26  entitled to as a result of Defendants' engaging in Unfair Business Practices in

27  violation of California Bus. & Prof. Code §§ 17200 et seq.?

28  151.        What is the amount of attorney's fees that Plaintiff is

entitled to as a result of Defendants' engaging in Unfair Business Practices in violation of California Bus. & Prof. Code §§ 17200 et seq.?

152.            If the evidence proves that the conduct of the defendants was intentional and willful, is the Plaintiff entitled to punitive damages?

**E.      Intentional interference with Prospective Economic Advantage (COUNT V)**

153.            Were the Defendants' aware of Plaintiff's business relationship with re-seller Roy Brashears of www.hauntedventures.com?

154.            Did Defendant Tim Turner tell Brashears that Plaintiff had stolen his ideas/concept for antique photo-based changing portraits?

155.            Did Roy Brashears state in his feedback quote to Turner "You were the first to offer this unique product to the public many years ago."

156.            Where did Roy Brashears get the impression that Tim Turner had supposedly been the first to create and offer a line of lenticular changing portraits featuring antique photographic imagery?

157.            Defendant Tim Turner tell Breashears that Plaintiff was "negative" and should be avoided?

158.            Did Roy Brashears begin carrying Tim Turner's changing portraits at the same time that he advised the Plaintiff that he was dropping his products?

159.            Was Breashears' decision to drop Plaintiff's products based upon false statements about the Plaintiff that Tim Turner had communicated to him?

160.            Was Carrie Vines a satisfied customer of the Plaintiff's before she purchased product from the Defendants?

161.            Did Carrie Vines write the Plaintiff with praise for his work numerous times in the months following the completion of their April-May 2004 transaction?

162.     Did Carrie Vines end up writing a negative review of the Plaintiff's artwork and customer service in April 2005?

163.     Were the Defendants aware of Plaintiff's prior transaction with Carrie Vines?

164.     Did the Defendants and/or their agent/employee Brandon Champlin communicate false and damaging statements about the Plaintiff to Ms. Vines?

165.     What damaging statements about the Plaintiff were communicated by the Defendants to Ms. Vines regarding the Plaintiff?

166.     Were these statements made by Defendants and/or their agents regarding the Plaintiff true or false?

167.     Did any of these statements include Tim Turner's false and damaging claim of having had his changing portrait "concept" stolen by the Plaintiff?

168.     Did the Defendants interfere with Plaintiff's fledgling relationship with would-be "Haunted Memories" re-seller Chris Russell?

169.     Had Chris Russell agreed to represent Plaintiff's products at several tradeshows thoughout the Midwest / East Coast over the summer of 2005?

170.     Did Chris Russell renege on this agreement with Plaintiff after meeting and speaking with Defendant Tim Turner at the Ironstock event in June of 2005?

171.     Did Chris Russell then begin to represent and/or promote Defendants "Ghoulish Gallery" products instead?

172.     What caused Chris Russell to shun the Plaintiff and transact with his competitor instead?

173.     Was Chris Russell told false and damaging statements about the Plaintiff by Defendant Tim Turner?

174.     Did Defendant Tim Turner convey false and/or misleading

information about his experience in the field of lenticular changing portrait regarding his originality and / or "expertise?"

175.        Did Defendant Tim Turner call tradeshow promoter Missy Ballance in September 2005?

176.        Did Defendant Tim Turner attempt to dissuade Ballance from allowing Plaintiff participate in her then-upcoming folk art event "All-I-Day?"

177.        Did Defendant Tim Turner tell Missy Ballance that Plaintiff had been unethical in his business dealings?

178.        Did Defendant Tim Turner tell Missy Ballance that Plaintiff had stolen the antique photo based changing portrait concept from him at the Long Beach Haunted House maze in the early 1990s?

179.        Did Defendant Tim Turner tell Ballance that he would not participate in the show if Allen were allowed to attend?

180.        Did Defendant Tim Turner communicate similar false statements about the Plaintiff to another folk art show called "Halloween and Vine?"

181.        Did these false and damaging statements result in Plaintiff's being banned from ever exhibiting at their event?

182.        Were Plaintiff's artwork samples sent back marked "Refused - Return to Sender" by "Halloween and Vine" committee member, Ginny Betourne?

183.        In the event that the court finds that the Defendants engaged in Intentional Interference with Plaintiff's prospective economic advantage by tarnishing Plaintiff's image with falsehoods, is the plaintiff entitled to damages?

184.        What is the amount of damages Plaintiff would be entitled if Defendants are found to have engaged in Intentional Interference with Plaintiff''s prospective economic advantage?

185.        Would the Plaintiff be entitled to attorney's fees for defendants' engaging in Intentional Interference with Plaintiff''s prospective

economic advantage?

186.                    What is the amount of attorney's Plaintiff would be entitled to for defendants' engaging in Intentional Interference with Plaintiff''s prospective economic advantage?

187.                    Would the Plaintiff be entitled to punitive damages if the Defendant's Intentional Interference with his prospective economic advantage is found to be willful and malicous?

**F.    Trade Libel (COUNT VI)**

188.                    In his e-mail dated October 19th, 2004, Defendant Tim Turner told Plaintiff "I don't give a crap if you felt your reputation was smeared."

189.                    Whether Defendant in September 2005 Tim Turner suggested on a Haunted Industry message board, located at www.hauntedattraction.com, that the Plaintiff was "unethical" and "unprofessional."

190.                    In his e-mail dated October 19th, 2004, Defendant Tim Turner told Plaintiff "I'm about to launch a counter offensiver that will, in all likelihood, ruin you."

191.                    Did the Defendant Tim Turner suggest in an email to Bill Mauerhan that Plaintiff engaged in price gouging?

192.                    Did the Defendant Tim Turner write in an email to Jodi Infernari that Plaintiff engaged in "mud slinging?"

193.                    Did the Defendants imply that Plaintiff's products were "poorly crafted" "knock-offs" on their website "The Ghoulish Gallery"?

194.                    Did the Defendant Tim Turner falsely write that Plaintiff is "unprofessional?"

195.                    Did the Defendant Tim Turner falsely suggest that Plaintiff is "widely disliked in the haunt industry?"

196.                    Did the Defendants falsely state that Plaintiff "does not

1  guarantee his work?"

2     197.            Did the Defendant Tim Turner falsely write that Plaintiff

3  "is unethical?"

4     198.            Did the Defendants suggest that Plaintiff "was curt and

5  unprofessional to say the least" in the fabricated feedback quote attributed to

6  Plaintiff's former customer Carrie Vines?

7     199.            Is Carrie Vines' criticism of Allen's product and services

8  factually accurate as stated in the feedback comment attributed to her on "The

9  Ghoulish Gallery" website?

10    200.            Does evidence of Plaintiff's e-mail correspondence with

11 Carrie Vines show that he treated her in a manner that was "curt and unprofessional,

12 to say the least?"

13    201.            Does the evidence show that Plaintiff Edward Allen

14 shipped the Vines' order late?

15    202.            What prompted Carrie Vines to submit and/or agree to a

16 negative review of Plaintiff's products and services?

17    203.            Was Carrie Vines prompted to write a damaging review of

18 Plaintiff's products and services after the Defendants communicated false and

19 damaging statements to her regarding Plaintiff?

20    204.            When was Ms. Vines' feedback review composed and

21 submitted to the Defendants?

22

23    205.            Did Vines contact the Plaintiff with her supposed concerns

24 before submitting and/or agreeing to the posting of her negative review of his

25 products/services?

26    206.            Did the Plaintiff contact Vines via e-mail in a good faith

27 effort to resolve a discovered problem?

28    207.            If the evidence shows that the Defendants tarnished

Plaintiff's image with falsehoods that prompted the Vines to write shun Plaintiff and write a damaging review, does that constitute tortious interference with Plaintiff's business?

208.        Was Carrie Vines the actual author of the feedback quote that is attributed to her?

209.        Did Carrie Vines actually author the e-mail purportedly sent by her to the Plaintiff on April 28th, 2005?

210.        Did Plaintiff have a phone conversation with Vines following the receipt of the April 28th, 2005 e-mail, and if so, what was the tone and subject matter of that conversation?

211.        Did the Defendants state on their website "We are the first. We will be the last one standing"?

212.        Whether Defendant Tim Turner engaged in trade libel against the Plaintiff by hosting a customer review from a "John in Canada" on his website.

213.        Whether Defendant Tim Turner engaged in trade libel against the Plaintiff by hosting the customer review from "Carrie V." on his website.

214.        Whether Defendant Tim Turner engaged in trade libel against the Plaintiff by posting false and damaging statements about the Plaintiff under the pseudonym "Mary Sinclair" on the "Haunted Attraction" message board.

**Defendants' Contested Facts:**

1.      Whether April Turner is an owner of the Ghoulish Gallery.

2.      Whether April Turner is an employee of the Ghoulish Gallery.

3.      Whether April Turner is a partner in the Ghoulish Gallery.

4.      Whether Brandon Champlin is an employee of Ghoulish Gallery.

5.      Whether Edward Allen uses the alias "Master Gracey" on the internet.

6.      Whether Edward Allen has posted comments on the Haunted Attraction message board using the alias "Master Gracey."

7.      Whether Edward Allen contacted members of the Halloween & Vine festival committee to discredit Tim Turner and to suggest that Allen replace Turner in the festival.

8.      Whether Edward Allen and/or his agents/employees made comments to trade show attendees that Tim Turner was a rip-off artist, a thief and stole ideas from Allen.

9.      Whether Edward Allen disparaged Tim Turner and his products to Barry Schieferstein.

10.      At the February 2006 Haunt X convention, whether Plaintiff's employee/agent accused Tim Turner of being a homosexual.

11.      Whether, by placing a sign and/or agent in the lobby of the LAX Hilton during the 2006 Haunt X convention, Edward Allen diverted traffic from the convention to Allen's rented conference room upstairs.

12.      Whether guests to the Haunt X convention thought that Edward Allen's exhibit was part of the Haunt X convention.

13.      Whether a reasonable person would believe that a posting Edward Allen made on a message board about hypercompetitiveness being a mental disorder was about Tim Turner.

14.      Whether telling potential customers that Tim Turner has a diagnosable

1  mental disease would have a negative effect on Mr. Turner's business.

2       15.    For what period of time did Edward Allen redirect visitors to

3  www.ghoulishgallery.com  his own website, www.hauntedmemories.com.

4       16.    Whether Edward Allen copied the format of Tim Turner's advertising.

5       17.    Whether Edward Allen copied ideas from Tim Turner's Ghoulish

6  Gallery website.

7       18.    Whether Edward Allen's Haunted Memories website is "highly regarded

8  in the industry as not only the original creator of changing portraits, but possessing

9  the highest quality of imagery."

10      19.    Whether the counter on Edward Allen's Haunted Memories website is

11 an accurate gauge of the number of visitors to the site.

12

13                          **VII.   EXHIBITS**

14      The exhibits to be offered at the trial are as follows:  See Final Exhibit List.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PRETRIAL ORDER**                                          06CV 0371 L NLS

# VIII.  WITNESSES

The following witnesses are expected to testify at trial:

| **Plaintiff's Witnesses** | **Defendants' Witnesses** |
| --- | --- |
| Edward Allen | Edward Allen |
| Tim Turner | Scott Broad |
| Roy Y. Taylor | Norm Lanier |
| Al Magliochetti | Robert Lupo |
| John Allen | Leonard Pickel |
| April Turner | Chris Russel |
| | Tim Turner |
| | Carrie Vines |
| | Sam Vines |
| | Jessica Zemek |

The following witnesses may be called to testify at trial:

| **Plaintiff's Witnesses** | **Defendants' Witnesses** |
| --- | --- |
| Susan Bartolucci | Jeff Baham |
| Ginny Betourne | Roy Brashear |
| Brad Pitt | Bill Livingston |
| Jennifer Aniston | Karen Murphy |
| Thomas Cook | Wil Schock |
| Ken Conley | Kirsten Wright |
| Russ Luckich | |
| Steve Cotroneo | |
| Ronald L. Pardini | |
| John Hart | |
| Brandon Champlin | |

# IX.   ISSUES OF LAW

**PRETRIAL ORDER**                                    06CV 0371 L NLS

The following issues of law, and no others, remain to be litigated upon the trial:

**Plaintiff's Issues of Law:**

1.     Are the co-owners of a business jointly liable for any and all illegal activities perpetrated during the operation of their business?

2.     Is April Turner co-owner of "The Ghoulish Gallery?"

**A.     Copyright infringement of Plaintiff's website for "Haunted Memories Changing Portraits.  (COUNT I)**

3.     Is the Plaintiff the legal owner of the copyright of the "Haunted Memories" website and all of the original content contained within?

4.     Does Plaintiff hold valid a copyright to the content and design of the "Haunted Memories" website alleged to be infringed?

5.     By copyrighting the design of his website, did Plaintiff take reasonable precautions to protect the design and content of the website for his business "Haunted Memories Changing Portraits?"

6.     Did the Defendants have access to the "Haunted Memories" website alleged to be infringed?

7.     Did the Defendants create a competing website for their product after seeing the "Haunted Memories" website?

8.     Did the Defendants incorporate designs and content from Plaintiff's website in their website?

9.     In creating their website for "The Ghoulish Gallery," did the actions of the Defendants constitute a "fair use" of Plaintiff's designs and content under the Copyright Act?

10.     Did Defendants obtain imagery from Plaintiff's "Haunted Memories" website through improper means?

11.     If the Defendants unlawfully obtained imagery of the charcoal frame from the "Haunted Memories" website, does that constitute copyright infringement?

12.    If the Defendants unlawfully obtained imagery of the brown frame from the "Haunted Memories" website, does that constitute copyright infringement?

13.    Was Defendants' infringement of Plaintiff's copyrights intentional and willful?

14.    Was the Defendants' copying the Plaintiff's brown frame image done willfully and with malice?

15.    Was the Defendants' copying the Plaintiff's charcoal frame image done willfully and with malice?

16.    Was the Defendants' copying the Plaintiff's mini-biographies image done willfully and with malice?

17.    Was the Defendants' copying the general look of the Plaintiff's website, "Haunted Memories" done willfully and with malice?

18.    Whether Defendants acted with intent to deceive in the course of committing the acts underlying Plaintiff's copyright infringement claims.

19.    Was the conduct of Defendants willful, for the purposes of increased statutory damages, for Defendants' copyright infringement of Plaintiff's website for "Haunted Memories Changing Portraits?"

20.    If the evidence shows that Defendants infringed upon the Plaintiff's copyright for his "Haunted Memories" website, is the Plaintiff entitled to an injunction restraining Defendants, their distributors, officers, agents and employees, and all persons acting in concert with them, from engaging in further such acts in violation of the copyright laws?

21.    What damages are Plaintiff entitled to if Defendants infringed the "Haunted Memories" website's copyright protected designs and content?

22.    What is the amount of statutory damages to be awarded to Plaintiff for the Defendants' copyright infringement of Plaintiff's website for "Haunted Memories Changing Portraits?

23.     The amount of attorney's fees if any, to be awarded to Plaintiff for Defendants' copyright infringement of Plaintiff's website for "Haunted Memories Changing Portraits."

**B.     Federal Unfair Competition - False Advertising (COUNT II)**

24.     Did Defendants unlawfully make false statements of fact about the goods, services, or commercial activity of their business "The Ghoulish Gallery?"

25.     Did Defendants unlawfully make and/or publish false and damaging statements of fact about the goods, services, or commercial activity of Plaintiff's competing business "Haunted Memories Changing Portraits?"

26.     Did the false statements made by Defendants either deceive, or have the potential to deceive, a substantial portion of its targeted audience?

27.     Were the false statements made by Defendants likely to affect the purchasing decisions of its audience?

28.     Were the false statements made by the Defendants employed specifically for the purpose of influencing consumers to buy Defendants' products?

29.     Did the false statements made by the Defendants involve goods or services in interstate commerce?

30.     Do Defendants hold a valid copyright for "The Ghoulish Gallery" dating back to 1991?

31.     Did Defendants falsely advertise that they held a valid copyright for "The Ghoulish Gallery" dating back to 1991?

32.     Did the Defendants engage in false advertising by fabricating a copyright claim of 1991?

33.     Did Defendants hold a valid copyright for "The Ghoulish Gallery" dating back to 1995?

34.     Did Defendants falsely advertise that they held a valid copyright for "The Ghoulish Gallery" dating back to 1995?

35.    In 2005, did Defendants claim to have been doing business as "The Ghoulish Gallery" for "ten years?"

36.    Have the Defendants engaged in false advertising by claiming that they have been doing business as "The Ghoulish Gallery" "Since 1995?"

37.    Did the Defendant engage in false advertising by falsely stating that he originated the concept of an "antique photo-based" lenticular changing portrait in the "early 1990's?"

38.    Did the Defendant Tim Turner engage in false advertising by falsely stating that he had "created antique style changing portraits in the early 1990's?"

39.    Have the Defendants obtained gains, profits, and advantages as a result of false statements?

40.    Did any false statements made by Defendants either result in, or were they likely to result in, injury to the Plaintiff?

41.    Has Defendant Tim Turner engaged in the practice of false advertising by fabricating claims of having done special effects work for Hollywood?

42.    Has Defendant Tim Turner engaged in the practice of false advertising by stating that he is a "veteran special effects artist?"

43.    If the evidence shows that defendants' fabricated the negative review attributed to "Carrie V. - Former 'Haunted Memories' customer," does that constitute False Advertising?

44.    If the evidence shows that defendants' fabricated the positive review of Defendants' product attributed to "Erin & Colm" does that constitute False Advertising?

45.    If the evidence shows that defendants' fabricated the negative review of Plaintiff's product attributed to "John in Canada" does that constitute False Advertising?

46.    If the evidence shows that defendants' fabricated the review attributed to "John/Cliff/Clifford in Long Beach" does that constitute False Advertising?

47.    If the evidence shows that defendants' fabricated the positive review of Defendants' product attributed to "Brad Pitt and Jennifer Anniston" does that constitute False Advertising?

48.    If the evidence shows that defendants' fabricated the positive review of Defendants products attributed to "Mark & Diana" does that constitute False Advertising?

49.    Does feedback fabrication constitute false advertising?

50.    Does altered feedback constitute false advertising?

51.    Did the Defendants engage in false advertising by publishing altered customer feedback on their website?

52.    Have the Defendants obtained gains, profits, and advantages as a result of any false advertising statements?

53.    Has the Plaintiff suffered, and does he continue to suffer irreparable damages resulting from Defendants' unlawful conduct, including, but not limited to, the direct diversion of consumers and accompanying sales from Plaintiff to Defendants?

54.    If the evidence shows that Defendants engaged in the unlawful practice of false advertising, is the Plaintiff entitled to an injunction restraining Defendants, their distributors, officers, agents and employees, and all persons acting in concert with them, from engaging in further such acts?

55.    Is the Plaintiff entitled to damages as a result of the Defendants' falsifying the longevity of their business?

56.    If evidence shows that the Defendants engaged in false advertising, is Plaintiff entitled to damages?

57.    What is the amount of damages that Plaintiff is entitled to if Defendants engaged in false advertising, which put the Plaintiff at a disadvantage?

58.    The amount of attorney's fees if any, to be awarded to Plaintiff for Defendants' engagement in unfair business practices through false advertising.

**C.     Unfair Competition - California Common Law**

59.     Did the Plaintiff invest substantial time, money, talent, and effort in the development of his changing portrait characters and the design of the website for his business "Haunted Memories Changing Portraits?"

60.     Did the Defendants unlawfully appropriate the Plaintiff's works at little or no cost?

61.     Did the Defendants unlawfully appropriate Plaintiff's images, designs, concepts, and products without the specific approval or authorization to do so?

62.     If the evidence shows that Plaintiff was using the "Ruben" font for his changing portrait business, "Haunted Memories," before the Defendant's used it for their changing portrait business, "The Ghoulish Gallery," does that preclude them from using the "Ruben" font as well?

63.     Did the Defendants use unfair and unlawful means in an attempt to compete with Plaintiff?

64.     If the evidence shows that defendants' fabricated their customer feeback comments from "Carrie V.," "John/Cliff/Clifford in Long Beach," "Brad Pitt and Jennifer Aniston," "John in Canada," "Ken Conley," "Mark & Diana," and/or "Erin & Colm" does that constitute Unfair Competition?

65.     Does the fabrication of positive feedback comments for one's own business constitute unfair competition?

66.     Does the fabrication of positive feedback comments for one's own business constitute fraud?

67.     Does the material alteration feedback constitute unfair competition under California Common Law?

68.     If the evidence shows that Defendants engaged in unfair competition by using altered and/or fabricated feedback, which put the Plaintiff at a disadvantage, is the Plaintiff entitled to an injunction restraining Defendants, their distributors,

officers, agents and employees, and all persons acting in concert with them, from engaging in further such acts in violation of the unfair competition?

69.     What statutory damages are Plaintiff entitled to if Defendants engaged in such unfair competition?

70.     What is the amount of statutory damages to be awarded to Plaintiff for the Defendants' engaging in unfair competition?

71.     The amount of attorney's fees if any, to be awarded to Plaintiff for Defendants' engaging in unfair competition."

**D.     Unfair Business Practice (California Business & Prof. Code §§ 17200 et seq.) (COUNT IV)**

72.     Did Defendants use unlawful and unfair means in attempt to compete with Plaintiff?

73.     Did Defendants engage in unfair competition and unfair business practices against the Plaintiff in violation of Cal. Bus. & Prof. Code §§ 17200 et seq?

74.     Did Defendants unlawfully appropriate Plaintiff's images, designs, concepts, and/or products without specific approval or authorization to do so and have they used unlawful and unfair means in an attempt to compete with Plaintiff?

75.     In creating advertisements for their business that used identical font styles for both their business name (the "Ruben" font) and the tagline underneath (the "Rudelsberg" font) did the Defendants unlawfully create advertisements that were substantially similar in design to Plaintiff's pre-existing advertisements?

76.     Did the Defendants have a legal duty to distinguish the look and feel of their advertisements from those of the Plaintiff's?

77.     Whether Defendants acted with intent to deceive in the course of committing the acts underlying Plaintiff's copyright infringement claims.

78.     Did the Defendants engage in unfair business practice by falsifying the copyright claim of 1991?

79.     Did the Defendants create buyer confusion by writing the name of their

business in the same ("Ruben") font as the Plaintiff after it had been in use by the Plaintiff for 17 months previous to Defendants?

80.   Did the Defendants create buyer confusion by using a substantially similar brown frame jpeg image on their website as the Plaintiff after they had been in use by the Plaintiff for 17 months previous to Defendants?

81.   Did the Defendants attempt to create buyer confusion by incorporating the same black oval matting effect into their changing portrait designs as the Plaintiff had been using 17 months previously?

82.   Did the Defendants create buyer confusion by using a similar "spooky eyes" background for their website as the one that had been in use by the Plaintiff for 17 months prior to existence of their website?

83.   Did the Defendants create buyer confusion by using the same charcoal frame jpeg image as the one Plaintiff had been using on his site for 15 months prior to the existence of "The Ghoulish Gallery" website?

84.   Did the Defendants create buyer confusion by using the same "Buy it Now" buttons as the Plaintiff after they had been in use by the Plaintiff for 1 month previous to Defendants?

85.   Did the Defendants create buyer confusion by designating the child characters as "Little" after it had been in use by the Plaintiff for 17 months previous to Defendants?

86.   Did the Defendants create buyer confusion by using a advertisement flyer featuring most of the same elements or color, composition, and style?

87.   Have the Defendants engaged in unfair business practice by creating buyer confusion?

88.   Did the Defendants engage in unfair business practice by publishing a biased review of "The Ghoulish Gallery" website, products and/or customer service

written by their employee Brandon Champlin?

89.     Has Plaintiff been irreparably damaged as a direct and proximate result of Defendant's conduct?

90.     Is Plaintiff is entitled to injunctive relief whereby Defendants shall cease such unlawful business practices?

91.     Is Plaintiff is entitled to an award of damages as provided pursuant to Cal. Bus. & Prof. Code § 17203?

**E.     Intentional Interference with Prospective Economic Advantage (COUNT V)**

92.     Did Defendants have knowledge of Plaintiff's existing customers and business relationships?

93.     Did Defendants intentionally interfere with Plaintiff's existing customers and business relationships by directly diverting Plaintiff's existing customers and business relationships to Defendants' website?

94.     Was it as a direct and proximate cause of Defendants that Plaintiff has been and continues to be irreparably damaged?

95.     Did Defendants intentionally interfere with Plaintiff's relationship with at least one resale customer?

96.     Did an interference with at least one resale customer result in a loss of sales for Plaintiff Edward Allen?

97.     Did this interference with at least one resale customer result in a unlawful gain of economic advantage for the Defendants?

98.     Does the conduct of Defendants constitute intentional interference with the prospective economic advantage of Plaintiff?

99.     If the Defendants are found to have engaged in intentional interference with prospective economic advantage, is Plaintiff entitled to an award of damages as may be proven at trial?

100.   Has any communication of false statements materially and substantially

induced current and potential customers not to conduct business with the Plaintiff Edward Allen?

101.   As a direct result of Defendants' conduct, has Plaintiff lost sales from current and/or potential customers?

102.   As a direct and proximate result of Defendants' conduct, has Plaintiff been irreparably damaged?

103.   Is Plaintiff is entitled to injunctive relief whereby Defendants shall cease communicating false statements disparaging Plaintiff and the quality of Plaintiff's products?

104.   Is Plaintiff entitled to an award of damages from Defendants as a result of lost sales from current and/or potential customers?

105.   What damages are Plaintiff Edward Allen entitled to?

**F.     Trade Libel (COUNT VI)**

106.   Have Defendants made false statements disparaging Plaintiff and the quality of Plaintiff's products?

107.   Have the Defendants hosted false statements disparaging Plaintiff and the quality of Plaintiff's products on "The Ghoulish Gallery" website?

108.   Have the Defendants communicated these false statements to other persons and/or entities orally and in writing?

109.   Is it illegal for a competitor to fabricate a negative review of a competitor's product?

110.   Is it illegal for a competitor to knowingly host a fabricated negative review of a competitor's product?

111.   Did Defendants engage in Unfair Competition by diverting Plaintiff's former customer Carrie Vines business away from the Plaintiff with falsehoods?

112.   Is the Plaintiff entitled to an award of damages for Defendants' interference with his former customers?

113.   Has this communication of false statements materially and substantially

induced current and potential customers not to conduct business with the Plaintiff Edward Allen?

114.   As a direct result of Defendants' conduct, has Plaintiff lost sales from current and/or potential customers?

115.   As a direct and proximate result of Defendants' conduct, has Plaintiff been irreparably damaged?

116.   Is Plaintiff is entitled to injunctive relief whereby Defendants shall cease communicating such false statements disparaging Plaintiff and the quality of Plaintiff's products?

117.   Is Plaintiff entitled to an award of damages from Defendants as a result of lost sales from current and/or potential customers?

118.   What is the amount of damages that Plaintiff Edward Allen in entitled to as a result of Defendants committing acts of trade libel against both him and his business "Haunted Memories Changing Portraits?"

**Defendants' Issues of Law:**

Plaintiff's Complaint

1.      Whether any of Plaintiff's claims are based upon a federally registered copyright.

2.      Whether Defendants copied Plaintiff's website.

3.      Whether Plaintiff's website was the subject of a registered copyright.

4.      If Plaintiff is unable to demonstrate that Defendants infringed upon a registered copyright, whether Defendants are entitled to attorneys' fees under 17 U.S.C. 504 as the prevailing party.

5.      Whether any statements of opinion allegedly made by or on behalf of Defendants about Edward Allen or Edward Allen's products are actionable.

6.      Whether any of the conduct proven by Edward Allen constitutes false advertising under Section 43(a)(1)(B) of the Lanham Act.

7.      Whether any of the conduct proven by Edward Allen constitutes unfair competition under California common law.

8.      Whether any of the conduct proven by Edward Allen constitutes unfair business practices under California Business and Professions Code Section 17200 et seq.

9.      Whether any of the conduct proven by Edward Allen constitutes intentional interference with prospective economic advantage under California law.

10.     Whether any statements of opinion allegedly made by or on behalf of Defendants about Plaintiff or Plaintiff's products are actionable.

11.     Whether any of the conduct proven by Edward Allen constitutes trade libel under California law.

12.     Whether the First Amendment to the U.S. Constitution provides a complete or partial defense to some or all of Plaintiff's claims herein.

13.     Whether some or all of Plaintiff's claims herein are barred because there

is no likelihood of confusion created because the goods of Plaintiff and Defendant Turner are distinguishable.

14.     Whether some or all of Plaintiff's claims herein are barred because Defendant Turner is the author and lawful common copyright owner, or licensee, of the materials for which Plaintiff claims ownership and which is the foundation of Plaintiff's Complaint.

15.     Whether some or all of Plaintiff's claims herein are barred because Plaintiff is guilty of unclean hands and, therefore, is barred from any legal or equitable relief under each of the purported causes of action in the Complaint.

16.     Whether some or all of Plaintiff's claims herein are barred because Defendants' conduct was justified or privileged.

17.     Whether some or all of Plaintiff's damages sought herein are barred because Plaintiff does not have registered copyrights on the items that he claims Defendants have infringed.

18.     Whether some or all of Plaintiff's claims herein are barred because any infringement by Defendants, or any of them, of Plaintiff's alleged copyrights was innocent and without knowledge or notice of Plaintiff's purported copyright rights.

19.     Whether some or all of Plaintiff's claims herein are barred because Plaintiff has misused the copyright at issue in this lawsuit, and has taken the actions alleged in the Complaint for anti-competitive purposes, to try to obtain a monopoly, and to try to illegally restrain trade and commerce in violation of federal and California law.

20.     Whether some or all of Plaintiff's claims herein are barred because Plaintiff cannot demonstrate that he has suffered actual harm as a result of Defendants' conduct.

21.     Whether Plaintiff is barred from recovering for declaratory and injunctive relief on the allegations of the Complaint because Plaintiff has an adequate

remedy at law.

22.     Whether some or all of Plaintiff's claims herein are barred because Plaintiff has failed to mitigate his alleged damages.

23.     Whether some or all of Plaintiff's claims herein are barred because Plaintiff did not suffer any damages and Defendants, and each of them, did not earn any profits as a result of the actions of Defendants alleged in the Complaint.

24.     Whether some or all of Plaintiff's claims herein are barred because Defendants have at all times acted in good faith and without malice towards Plaintiff.

25.     Whether some or all of Plaintiff's claims herein are barred because Plaintiff's alleged damages, if any, were caused solely, or in the alternative, were proximately caused, by the acts, wrongs, omissions, intentional conduct and/or negligence of third parties or a third party, for whose acts Defendants are in no way liable or responsible.

26.     Whether Plaintiff's claim for intentional interference with prospective economic advantage is barred because third parties have the constitutional right to associate and conduct business with Plaintiff, Defendants or anyone else with whom they so choose.

27.     Whether Plaintiff's claim for intentional interference with prospective economic advantage is barred because Plaintiff did not have an economic relationship with the third parties referenced in the Complaint that probably would have resulted in an economic benefit to Plaintiff.

28.     Whether Plaintiff's claim for intentional interference with prospective economic advantage is barred because Defendants were not aware of any alleged economic relationship between Plaintiff and the third parties referenced in the Complaint.

29.     Whether Plaintiff's claim for intentional interference with prospective economic advantage is barred because Defendants had no intent to disrupt any alleged economic relationship between Plaintiff and the third parties referenced in the

Complaint.

30.    Whether Plaintiff's claim for intentional interference with prospective economic advantage is barred because there was no alleged economic relationship between Plaintiff and the third parties referenced in the Complaint, and that even if there were, no such relationship was disrupted based on Defendant's conduct.

31.    Whether some or all of Plaintiff's claims herein are barred because at all pertinent times, each Defendant maintained his or her separate existence, and did not act as the alter ego of the other.

32.    Whether Plaintiff's claim for trade libel is barred because truth is a complete defense to defamation claims.

33.    Whether Plaintiff is barred from recovering on the allegations of the Complaint relating to false advertising, because Defendants' advertisements do not contain false statements.

Defendants' Counterclaim

34.    Whether Edward Allen's conduct proven by Tim Turner constitutes false advertising under Section 43(a)(1) of the Lanham Act.

35.    Whether Edward Allen's conduct proven by Tim Turner constitutes untrue or misleading advertising under California Business and Professions Code Section 17500.

36.    Whether Edward Allen's conduct proven by Tim Turner constitutes unfair competition under California Business and Professions Code Section 17200 et seq.

37.    Whether Edward Allen's conduct proven by Tim Turner constitutes unfair competition under California common law.

38.    Whether Edward Allen's conduct proven by Tim Turner constitutes intentional interference with prospective economic advantage under California law.

39.    Whether Edward Allen's conduct proven by Tim Turner constitutes

trade libel under California law.

40.    Whether Edward Allen's conduct proven by Tim Turner constitutes defamation under California law.

41.    Whether Defendants are entitled to damages on their Counterclaim.

42.    Whether Defendants are entitled to an injunction to prevent Plaintiff from directly or indirectly engaging in the unlawful conduct and practices proven by Tim Turner.

43.    Whether Defendants are entitled are attorneys' fees, and if so, in what amount.

44.    Whether Defendants are entitled to recover their litigation expenses.

## X.    ADMISSIONS

The foregoing admissions having been made by the parties, and the parties having specified the foregoing issues of fact and law remaining to be litigated, this order shall supplement the pleadings and govern the course of the trial of this cause, unless modified to prevent manifest injustice.

## XI.    COURT TRIAL

This case shall be tried by the Court without a jury.

## XII.    BIFURCATION

The trial of this case shall not be bifurcated.

## XIII.  TRIAL ESTIMATE

Time estimated for trial is five (5) days.

Dated: _____          _____

1    United States District Judge

2

3

4    APPROVED AS TO FORM AND CONTENT:

5

6

      _/S/_____
7    EDWARD J. ALLEN, Plaintiff in Pro Se

8

9

      _/S/_____
10   JERROLD ABELES
     Attorneys for Defendants and Counterclaimants
11   Tim Turner dba The Ghoulish Gallery and April Turner

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28