**FILED**

NOV 2 0 2007

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDWARD ALLEN, an individual, | ) | Civil No. 06cv371 NLS |
| Plaintiff, | ) | **MEMORANDUM AND RULING** |
| v. | ) | **FOLLOWING TRIAL; FINDINGS OF** |
| | ) | **FACT AND CONCLUSIONS OF LAW** |
| THE GHOULISH GALLERY, an entity of unknown form; TIM TURNER, an individual, APRIL TURNER, an individual, and DOES 1 through 10, inclusive, | ) | |
| Defendants. | ) | |
| TIM TURNER, an individual, APRIL TURNER, an individual, dba THE GHOULISH GALLERY, | ) | |
| Counterclaimants, | ) | |
| v. | ) | |
| EDWARD ALLEN, an individual, | ) | |
| Counterdefendant. | ) | |

1

## BACKGROUND

Edward Allen ("Allen" or "Plaintiff") and Tim Turner ("Turner" or "Defendant") design, create, market and sell "changing portraits" in the haunt industry. These two artists–and competitors–take an antique photo and use lenticular technology to make the portrait "change" into a haunted spirit, vampire or other spooky creature. The portrait is all inclusive and the viewer need only slightly shift position to see the alternating images.

Allen created a website for his business, Haunted Memories Changing Portraits ("Haunted Memories"), in 2003. Turner created the website for his business, The Ghoulish Gallery, in 2004. The parties have competed with and sparred with one another since the time Turner launched his website. Then, in February 2006, Allen sued Turner claiming that Turner copied Allen's federally copyright-protected website, and engaged in federal unfair competition for false advertising, common law unfair competition, unfair business practices, intentional interference with prospective economic advantage and trade libel.[1] Turner counterclaimed, alleging that Allen committed federal unfair competition for false advertising, false or misleading statements under state law, common law unfair competition, intentional interference with prospective economic advantage, trade libel and defamation.

On April 17, 2007, the parties consented to magistrate judge jurisdiction for all matters arising in this case, including trial. Ten days later Plaintiff substituted in as his own counsel. The Court conducted a bench trial from October 1 to 5, 2007. Plaintiff proceeded pro se, acting as both party and advocate while he testified in narrative form and performed all the functions of trial counsel. Jerrold Abeles, Esq. and Amy Borlund, Esq. represented Defendant. The Court heard testimony from the parties and outside witnesses, examined admitted exhibits and reviewed both pre and post-trial briefs. The exhibits and witness testimony evidenced the parties' rancorous business relationship.

The Court has considered all the admitted evidence and arguments, and explains its decision and reasoning in the discussion below. The Court also attaches, in an appendix, its findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

---

[1] Allen also sued Turner's wife, April Turner, who also counterclaimed against Allen. Before trial, however, Defendant notified the Court in his trial brief that April Turner sought to dismiss her counterclaims against Allen. Then at trial, the Court granted Defendant's motion for nonsuit as to April Turner. April Turner, therefore, is no longer a party.

1

### DISCUSSION

2

**A.     Federal Copyright Infringement.**

3     Plaintiff claimed he held a valid copyright in the contents of the "Haunted Memories Changing

4  Portraits Website."  At trial Plaintiff sought the benefit of the presumption of validity of the copyright by

5  asking the Court to take judicial notice of the Certificate of Registration from the U.S. Copyright Office

6  ("registration certificate") for his website.  [Trial Ex. 55-1 to 55-2].  Judicial notice of a copyright

7  registration may be appropriate pursuant to Fed.R.Evid. 201(b).[2]  *See Idema v. Dreamworks, Inc.*, 90

8  Fed. App'x. 496, 498 (9th Cir. 2003). At trial the Court agreed to take judicial notice of the registration

9  certificate for the name of the website but not for its contents, as explained below.

10          **1.     Ownership and Originality.**

11               **a.     Judicial Notice of the Copyright Registration and Name of the Website.**

12     A copyright registration certificate provides prima facie evidence of the validity of the copyright,

13  such that the holder of the registration certificate need not put on evidence of ownership or originality in

14  the copyrighted work. *See* 17 U.S.C. § 410©), *Educ. Testing Serv. v. Simon*, 95 F. Supp. 2d 1081, 1087

15  (C.D. Cal. 1999). Rather, the burden is on the defendant to overcome the presumption of validity.

16  *Bibbero Systems, Inc. v. Colwell Systems, Inc.*, 893 F.2d 1104, 1106 (9th Cir. 1990).

17     Plaintiff's evidence of validity is his registration certificate.  The Copyright Office issued the

18  registration certificate on December 14, 2004 under registration number TX-6-092-441.  The

19  information contained on the registration certificate lists the title of the work as the "Haunted Memories

20  Changing Portraits Website," the author of the work as Edward Joseph Allen, the nature of the work as

21  "audiovisual material."[3]  Notably absent from the registration certificate is a certified copy of the

22  audiovisual material that depicts the <u>contents</u> of Plaintiff's website.  Defendant objected to the Court

23

24          [2]Federal Rule of Evidence 201(b) provides: (b) Kinds of Facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (a) generally known within the territorial jurisdiction of the trial court, or (2) capable of accurate and ready determination by resort to sources

25  whose accuracy cannot reasonably be questioned.

26          [3]Plaintiff registered the website with the Copyright Office as an "audiovisual work."  *See* 17

27  U.S.C. § 102(a)(6).  The Copyright Act defines "audiovisual works" as "works that consist of a series of related images which are intrinsically intended to be shown by the use of machines or devices (in this case a computer) such as projectors, viewers, or electronic equipment, together with accompanying

28  sounds, if any, regardless of the nature of the material objects, such as films or tapes in which the works are embodied." 17 U.S.C. §101.

3

1  taking judicial notice of the copyright registration without any evidence of the contents of the

2  copyrighted material.

3        In connection with his request for judicial notice, Plaintiff proffered  a CD-ROM which he

4  claimed is a duplicate copy of the CD-ROM submitted to the Copyright office as evidence of his original

5  work. [Trial Ex. 55-5.]  Defendant objected to admission of the CD-ROM on grounds that Plaintiff did

6  not produce it in discovery and in any event could not authenticate it as the same CD-ROM that was sent

7  to the Copyright Office.  Plaintiff testified that he did not personally submit any audiovisual material to

8  the Copyright Office.  Rather, he applied through a copyright service called Copyright Website LLC, 742

9  Widgeon Street, Foster City, CA, Benedict O'Mahoney, President.  He further testified that he did not

10  send O'Mahoney any evidence of the images he sought to copyright.  Rather, according to Plaintiff,

11  O'Mahoney must have made a CD-ROM from Plaintiff's website in or about December, 2004, and sent

12  it to the Copyright Office as a copy of Plaintiff's work.  The Copyright Office thereafter issued Plaintiff

13  a copyright registration for his website.  Plaintiff testified that he had not seen a copy of the CD-ROM

14  until O'Mahoney sent it to him with a cover letter approximately one week before trial. [Trial Ex. 55-3.]

15  Plaintiff did not call O'Mahoney to testify at trial; nor did he obtain a certified copy of the CD-ROM

16  from the Copyright Office which might have been self-authenticating under Fed.R.Evid. 902(4).

17        The Court found that Plaintiff failed to authenticate the CD-ROM as a copy of the audiovisual

18  material covered by the copyright registration.  Without that evidence, the Court could only take judicial

19  notice of the name of the website as that fact is readily ascertainable from the registration certificate.

20  Therefore, the Court ruled that Plaintiff was not entitled to the statutory presumption of validity in the

21  contents of his website.

22            **b.    Other Proof of Validity.**[4]

23        Failure to authenticate the CD-ROM, however, was not fatal to Plaintiff's proof of copyright

24  protection in the contents of his website.  The Court recognized that the "work" Plaintiff sought to

25  copyright was not the CD-ROM itself, but rather, a series of images that appeared on his website as it

26

27  ───────────────

28  [4] The Court considered the CD-ROM even though it had not been produced in discovery because
Defendant was well aware of the appearance of Plaintiff's website and because many of the same images
on the CD-ROM had been produced to Defendant in discovery.

4

1   existed in December 2004.[5]  *See Midway Mfg. Co. v. Arctic Int'l*, 547 F. Supp. 999, 1007 (N.D. Ill.

2   1982) (citing 1 NIMMER ON COPYRIGHTS § 2.03 (the original work of authorship should not be confused

3   with the material objects in which the work must be fixed)).  Plaintiff testified that the series of images

4   contained on the CD-ROM which he displayed via projector in the courtroom and from which he made

5   "screen shots"[6] [Trial Exs. 55-6 to 55-11]  accurately display the work for which he obtained copyright

6   protection.  Plaintiff also introduced screen shots of certain webpages from his website as they appeared

7   in December 2004 that he obtained via the Internet Archive Wayback machine (http://web.archive.org).[7]

8           From this evidence, Plaintiff claims he holds a valid copyright in everything found on his

9   Haunted Memories website, located at www.hauntedmemories.com, including: (1) the Ruben Font on

10   his business name "Haunted Memories;" (2) the Rudelsberg Font on his tag line "Spooky Antique

11   Changing Portraits;" (3) the "spooky eyeball" pattern in the website background; (4) the gallery of

12   characters portrayed in his changing portraits; (5) the charcoal frame jpeg image Plaintiff used to display

13   certain characters;[8] (6) the use of a "Buy It Now" button; (7) black oval matting around various character

14   pictures; (8) the use of mini-biographies for his characters; and (9) use of the "Little" designation on

15   biographies of his child characters.  Whether these elements qualify for copyright protection depends

16   upon whether individually or in combination they meet the tests for originality and fixation.  *See M.*

17   *Kramer Mfg., Inc. v. Andrews*, 783 F.2d 421, 433 (4th Cir. 1986).  The Court finds that the images on the

18   CD-ROM and screen shots are sufficiently fixed to fall within the meaning of the Copyright Act.

19   Originality is discussed below.

20   _____

21           [5]Before a copyright can attach to any original work of authorship, the work must be "fixed in any
     tangible medium of expression, now known or later developed, from which (it) can be perceived,

22   reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17
     U.S.C. § 102(a).  A work is "fixed" within the meaning of the Act "when its embodiment in a copy or

23   phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be
     perceived, reproduced, or otherwise communicated for a period of more than transitory duration." 17

24   U.S.C. § 101.  All that is required is that the work is capable of being "reproduced . . . with the aid of a
     machine or device." 17 U.S.C. § 102(a).

25           [6]Screen shots or screen prints are photographs of images taken from one or more website pages.

26           [7]The Internet Archive Wayback Machine is a service that allows people to visit archived versions
     of stored websites. *See* http://web.archive.org/collections/web/faqs.html (10/10/2007).

27

28           [8]In his trial brief, Plaintiff argued for protection for a brown frame jpeg image he used to display
     certain characters, but never presented any admissible evidence or testimony regarding that frame.  The
     Court, therefore, will not consider it.

## I.   Copyright Validity of Individual Elements of Website.

It was unclear from Plaintiff's testimony whether he claims a copyright in the individual components of his website or only in the selection, arrangement, and presentation of his website.  To the extent he claims a valid copyright in the individual components of his website, the Court finds he has failed to carry his burden of proof.  First, not only did Defendant present substantial evidence that the Ruben font is commonly used in the "Haunt Industry" and is in the public domain, [*See, e.g.,* Trial Exs. 11-1, 11-2, 110-2 and 198-1 to 198-11], but Plaintiff agreed to those facts [Pretrial Order Admitted Fact Nos. 91, 97].  The parties also agreed that Plaintiff did not author the Rudelsberg font and that the font was not custom-designed for him. [Admitted Fact Nos. 94, 95.]  Further, Defendant presented evidence that "Buy It Now" buttons are commonly used in the public domain as a feature of retail websites. [Allen Cross Examination; Lanier Testimony.]  And, Defendant testified that he got the idea to use black oval matting with a feathered edge from a colleague and that use of such a matting was typically Victorian. [Turner Testimony, Day 3.]  These individual elements are not original to Plaintiff or entitled to copyright protection.

Regarding the charcoal frame, Plaintiff testified he purchased the frame stock from Universal Framing and had it cut and assembled by Lyon Art Supply in Long Beach.  He testified he photographed the assembled frame, converted the photo to a jpeg image and used it to display certain of his characters on his website.  While Plaintiff's efforts with regard to the charcoal frame might meet the minimum level of creativity required for copyright protection, the frame itself is one commonly used to display "scary" photographs and not a proper subject for copyright protection. [*See, e.g.,* Trial Exs. 240-1, 241-1, 242-1.]  Similarly, the use of "Little" to designate child characters is hardly original to Plaintiff.  Finally, Plaintiff did not carry his burden to prove the "spooky eyeball" wallpaper on his website is original to him [See Trial Ex. 209-1].  Plaintiff, however, did testify that the specific mini-biographies for his characters are his creation.  In any event, as the Court notes in section 2(b) below, there is no evidence Defendant has copied any of Plaintiff's mini-biographies.

### ii.   Copyright Validity of Collective Elements of Website.

If specific components of a compilation are not original or would not be protected by themselves, a party nonetheless may have protection in the selection, arrangement, and presentation of such

1 components. 17 U.S.C. § 101; *Bensbargains.net, LLC v. XPBargains.com,* 2007 U.S. Dist. Lexis 60544,
2 *4-*5 (S.D. Cal. 2007). The required elements to establish copyright protection based on this theory
3 include:

> (1) the collection and assembly of pre-existing material, facts or data; (2)
> the selection, coordination, or arrangement of those materials; and (3) the
> creation, by virtue of the particular selection, coordination, or
> arrangement, of an original work of authorship.

7 *Id.* (citing *Feist Pubs., Inc. v. Rural Tel. Serv. Co.* 499 U.S. 340, 357 (1991)). Selection and
8 arrangement require the "exercise of judgment." *Id.* at *6 (citation omitted). Only some minimal level
9 of creativity is required. *Id.* at *5 (citation omitted).

10      The Court found that Plaintiff established by a preponderance of the evidence that he is entitled
11 to copyright protection in the selection, arrangement and presentation of the contents of his website as it
12 appeared in December 2004. Through the use of color, background wallpaper, text, specific gallery
13 portraits, specific frames, fonts, mats and original mini-biographies, Plaintiff created a unique work that
14 reflects his own creative and independent judgment. While copyright protection does not extend to the
15 individual components of that creation, it does extend to the work as a whole.

16     **2.**    **Whether Defendant Infringed.**

17        **a.**    **Standard for Copyright Infringement.**

18      To show infringement, in addition to ownership, Plaintiff must prove that Defendant copied the
19 "constituent elements of the work that are original." *Feist Pubs.*, 499 U.S. at 361. Without evidence
20 that Defendant directly copied Plaintiff, Plaintiff must submit "fact-based showings that the defendant
21 had access to the plaintiff's work and that the two works are substantially similar." *Funky Films, Inc. v.*
22 *Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1076 (9th Cir. 2006) (internal quotations omitted). To
23 determine substantial similarity, the trier of fact must examine the works themselves in detail. *Id.* at
24 1075.

25      The substantial-similarity test consists of an intrinsic and an extrinsic analysis. *Id.* at 1077. The
26 intrinsic test is only for the trier of fact, and "examines an ordinary person's subjective impressions of
27 the similarities between two works." *Id.* (internal quotations omitted). The extrinsic test is an objective
28 one and focuses on specific criteria that can be listed and analyzed. *Id.* (internal citation omitted).

1   Regarding a compilation work, only the selection and/or arrangement of the work are protected while the

2   individual unprotected components may be copied. *Benbargains.net LLC*, 2007 U.S. Dist. LEXIS at

3   *10-*11 (internal citations omitted). Where the compilation consists largely of uncopyrightable

4   elements, a court will find copyright infringement where there is "bodily appropriation of expression" or

5   "unauthorized use of substantially the entire item." *Id.* (finding insufficient similarity where defendants

6   copied or derived less than 70% of their selections from plaintiff's website) (quoting *Harper House, Inc.*

7   *v. Thomas Nelson, Inc.*, 889 F.2d 197, 205 (9th Cir. 1989)).

8         Here, the Court will focus the extrinsic test on comparing the selection and arrangement of the

9   websites' font, background, gallery pages, frames and matting.[9] The Court will compare images of

10  Plaintiff's website as it existed in December 2004 [Trial Exs. 55-6 to 55-11][10] with Defendant's website

11  as it existed in April 2005 [Trial Ex. 248], October 2005 [Trial Ex. 253], January 2006 [Trial Ex. 249]

12  and June 2006 [Trial Ex. 250].

13             **b.    Substantial Similarity of Websites.**

14         Plaintiff claims Defendant copied the selection and arrangement of his compilation work, the

15  Haunted Memories Changing Portraits website. Defendant argues that while he uses some of the same

16  individual components on his website that are common in the haunt industry, the selection and

17  arrangement of his compilation differ substantially from Plaintiff's work. Comparing Plaintiff's

18  website–as it appeared at the time it was copyrighted in December 2004–to several versions of

19  Defendant's website–as it appeared <u>after</u> Plaintiff's website became protected–the Court finds that there

20

21        [9]The Court will not consider use of the "Buy It Now" buttons, mini-biographies or "Little" designation for the characters because none of those components appear on the screenshots Plaintiff

22  submitted to illustrate his website as it appeared in December 2004.

23        [10]As evidence of how Plaintiff's website appeared in December 2004, the Court will use Trial Exs. 55-6 to 55-11. At the end of the hearing on Plaintiff's request for judicial notice, the Court noted

24  Defendant's objections and found that Plaintiff "testified in court today that what appears on that CD-ROM is, in fact, the work he created and the work he sought copyright protection for back in December

25  of 2004." [Day 4 Transcript, 25:20-23.] The Court went on to explain that while it could not take judicial notice of the CD-ROM, it did "have evidence in the record that the screen shots from the CD-

26  ROM and the images displayed on the screen in the courtroom from the CD-ROM are accurate representations of what the plaintiff created and sought to copyright." [Day 4 Transcript, 26:4-7.] The

27  Court confirmed that because there was no presumption of ownership and originality, only evidence of it, the burden did not shift to Defendant. [Day 4 Transcript, 26:13-17.] Based on this ruling, the Court

28  corrects its Bench Trial Exhibit and Witness List [Doc. No. 129] to reflect that Trial Exs. 55-6 to 55-11 were part of the trial record and admitted into evidence. The Court also notes that it took judicial notice of Trial Exs. 55-1 to 55-2 to the extent they showed that Plaintiff registered the name of his website.

1   is no substantial similarity between the selection and arrangement of the parties' websites.

2        First, the Court examined the objective components of Defendant's website as it appeared in

3   April 2005 [Trial Ex. 248-1 to 248-5], the earliest evidence of Defendant's website after Plaintiff

4   received copyright protection, and found only general similarities. Defendant uses the same Ruben font

5   for the company name and the same Rudelsberg font for the tag line—the description below the company

6   name— that Plaintiff does. The layouts of the main page are generally similar in that each have tabs—of

7   different shapes—on the left side of the page to go to different sections of the websites. Framed portraits

8   on both sites have either no matting or black oval matting. But the websites differ because each site uses

9   a different color scheme: Plaintiff's is mostly black with some white, green, purple and yellow while

10   Defendant's is black with an earth tone, some blue and orange and different shades of green and yellow.

11   Plaintiff uses a spooky eyeball background while Defendant uses a lily pattern. The frames around the

12   portraits are different. Specifically regarding the gallery page, Defendant's website, as it appeared in

13   October 2005 [Trial Ex. 253-1 to 253-12], has a distinct background and does not use the same charcoal

14   frame that Plaintiff uses in most of his portraits. Further, the headings on the two gallery pages are

15   different. While the three-portrait-across layout is common to both, Plaintiff includes text between some

16   of the rows of images while Defendant does not. Plaintiff also has one row of portraits where there are

17   only two, instead of three, images. Finally, the characters displayed in the portraits of the two galleries

18   are all different.

19        Defendant's website as it appeared in January 2006 [Trial Ex. 249] had the same differences as

20   noted in the April 2005 version. Then, as of June 2006 [Trial Ex. 250], Defendant's website became

21   even more distinct with added colors and a different images surrounding the name of the website.

22   Except for the words "The Ghoulish Gallery" written in Ruben font, the layouts, color scheme,

23   background and frames are distinct from Plaintiff's copyrighted work.

24        In sum, the only substantial similarity the Court finds between the two websites based on the

25   objective test is use of the Ruben font for the business name and Rudelsberg font for the tag line. The

26   Ruben font, as both parties agree and as is evident in several exhibits, is publicly available and

27   commonly used in the haunt industry. The Rudelsberg font is also widely used in the haunt industry, as

28   Defendant testified. Further, the Court's subjective impression of the comparison between Plaintiff's

1  protected work and the different iterations of Defendant's work is that their websites are not

2  substantially similar.  Therefore, having compared Plaintiff's protected work with Defendant's work,

3  while the general layout and pattern of both websites appear similar, both the objective and subjective

4  tests reveal the similarities between the selection and/or arrangement of the websites are <u>not</u> substantial

5  enough to qualify as copyright infringement.  The Court therefore finds that Defendant did not infringe

6  Plaintiff's copyrighted website.

7  **B.    Federal Unfair Competition.**

8          Plaintiff claims that Defendant engaged in unfair competition by falsely advertising that The

9  Ghoulish Gallery has been in business since the 1990s, making disparaging remarks about Plaintiff's

10 business and fabricating customer feedback on The Ghoulish Gallery website.  Defendant

11 counterclaimed, arguing that Plaintiff engaged in unfair competition by trying to create products similar

12 to Defendant's products, purchasing www.ghoulishgallery.com (Defendant's website is

13 www.theghoulishgallery.com) and redirecting the internet traffic intended for Defendant to his own

14 website, displaying his products at the Haunt X convention where Plaintiff was not a registered vendor,

15 and advertising that he is the "originator" of haunted changing portraits.

16         Federal unfair competition claims under Lanham Act § 43(a) can be based on false advertising or

17 false designation of origin.  *See Lamothe v. Atlantic Recording Corp.*, 847 F.2d 1403, 1405-06 (9th Cir.

18 1988) (stating that § 43(a) prohibits "false advertising about the goods or services of the advertiser" and

19 "selling a good or service of one person's creation under the name or mark of another").  Regarding false

20 advertising, "[r]epresentations constitute commercial advertising or promotion under the Lanham Act if

21 they are 1) commercial speech; 2) by a defendant who is in commercial competition with plaintiff; 3) for

22 the purpose of influencing consumers to buy defendant's goods or services."  *See Rice v. Fox Broad.*

23 *Co.*, 330 F.3d 1170, 1181 (9th Cir. 2003).  Based on this definition, the Court will not consider Plaintiff's

24 false advertising claim predicated on disparaging remarks because such remarks about a competitor do

25 not constitute commercial advertising or promotion.  Likewise, the Court will not consider Defendant's

26 false advertising counterclaim based on product similarity, the redirecting of internet traffic or Plaintiff's

27 presence at Haunt X because those actions do not constitute commercial speech.

28         A claim based on false designation of origin involves "palming off" or "passing off" one's

1   product under another's name. *Smith v. Montoro*, 648 F.2d 602, 604 (9th Cir. 1981). "Passing off" is

2   express when a competitor labels its products with a mark identical to a competitor's label or expressly

3   misrepresents the origin of its product. *Id.* "Passing off" is implied when a company's advertising

4   material "impliedly represent[s] that the product it is selling was produced by the competitor." *Id.*

5   Section 43(a)'s protection against false designation need not involve use of a trademark, and may

6   include "reverse passing off" where a person removes the original trademark or label without permission

7   before reselling the product. *Id.* at 604-605. Section 43(a) also protects against a false association claim

8   where a trademark or other distinguishing device is used to "confuse consumers as to the origin,

9   approval, or endorsement of the product." *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992).

10          Here, no facts indicate that Defendant could be entitled to a false designation claim based on

11   similar products or the redirecting of internet traffic because Defendant does not allege that Plaintiff

12   tried to "pass off" his products as Defendant's or sell Defendant's products under his name. Neither

13   does Defendant have a false association claim based on Plaintiff's presence at Haunt X because

14   Defendant did not prove that the Haunt X convention used a distinct trademark or other device to show

15   its approval and endorsement of Plaintiff's products, and that Haunt X attendees were actually confused

16   about any such endorsement.

17          The Court will now evaluate the unfair competition claim based on Defendant's advertisement

18   that The Ghoulish Gallery has been in business since 1995, and Defendant's counterclaim regarding

19   Plaintiff's statement that he was the originator of changing portraits based on antique photos.

20          **1.      False Advertising Under Lanham Act § 43(a), 15 U.S.C. § 1125(a)(1)(B).**

21          To prove false advertising under the Lanham Act, a plaintiff must establish that the defendant:

22   (1) made false statements of fact about his or her own products in advertisements; (2) those

23   advertisements deceived or have the tendency to deceive a substantial segment of their audience; (3) the

24   deception is material (i.e. likely to influence a buyer's decision); (4) the defendant caused the goods to

25   enter interstate commerce; and (5) the plaintiff has been or is likely to be injured either by direct

26   diversion of sales to defendant or by lessening the goodwill of the plaintiff's products. *Rice*, 330 F.3d at

27   1180.

28   / / /

06cv371 NLS

1    **2.    Plaintiff's Claim for False Advertising.**

2    **a.    Proffered Evidence.**

3    Defendant, on his changing portrait website, claimed that The Ghoulish Gallery has been in

4    business since 1995. [*See, e.g.,* Trial Exs. 103-1, 120-1, 249-1, 250-1.] Defendant also said that as of

5    January 2005, The Ghoulish Gallery had been in business for about the last 13 years and that he made

6    his first portrait in 1991. [Admitted Fact No. 40.] To show that Defendant had actually not been in

7    business since the 1990s, Plaintiff proffered an email that Defendant wrote to him in July 2004, before

8    the launch of Defendant's website, that said he and his wife "always wanted to do a changing portrait

9    type effect but just couldn't figure out how to do it." [Trial Ex. 19-1, Admitted Fact No. 23.] In a follow-

10   up email, Defendant, after having asked Plaintiff about all of his product prices, also inquired for

11   specifics about the technology he used to create the changing portraits. [Trial Ex. 19-2, Admitted Fact

12   No. 22.] Further, Defendant testified that following a serious automobile accident in December 1996 he

13   did not work on changing portraits until 2000 or 2001, and in the pretrial order he admitted he did not

14   create, produce or market changing portraits from 1996 to 2002. [Turner Testimony, Day 5; Admitted

15   Fact No. 35.]

16   To rebut Plaintiff's claim of false advertising, Defendant submitted the following evidence: (1)

17   two receipts from March and April 1992 for changing portraits he sold at the House of Humor [Trial Ex.

18   171-1]; (2) a photo of a changing portrait he sold at the House of Humor in the early 1990s [Trial Ex. 1];

19   (3) a press release dated October 6, 1990 regarding the downtown Long Beach Association haunted

20   house "produced by Tim Turner" [Trial Ex. 179-1]; (4) an undated flyer advertising the Long Beach

21   Association haunted house that lists "The Ghoulish Gallery" presumably as an attraction within the

22   haunted house [Trial Ex. 170]; and (5) Defendant's mother's journal in which she mentions her son's

23   changing portrait business. [Trial Ex. 180-6.] Defendant, however, did not proffer any affirmative proof

24   The Ghoulish Gallery had been in business in the 1990s, such as a business registration or license, any

25   receipt for taxes paid for that business, or an actual portrait that he produced for the business.[11]

26   _____

27   [11] In his trial brief, Defendant referred to an email [Trial Ex. 47-1] where Plaintiff said he did not dispute that Turner made a changing portrait before he did. Defendant, however, never identified or moved to admit that document into evidence, so it is not before the Court. Even if it were, that statement

28   does not tend to prove that Defendant had been in business since the 1990s.

06cv371 NLS

1    The Court does not find Defendant's proffered evidence credible to prove this advertisement:

2    Since 1995, The Ghoulish Gallery has taken all the mystery and nostalgia
     of Halloween, combined it with spooky Victorian images, and mixed it
3    with the artistic talents of a Hollywood monster maker to conjure up an
     award winning selection of "spirited" Halloween specialty art commonly
4    known as changing portraits.

5    [Trial Ex. 103-1.]  First, the Court is dubious about the sales receipts from the House of Humor because

6    Defendant wrote out these receipts himself, and, while he dated them one month apart, he marked them

7    with the same receipt number.  Second, Defendant provided conflicting testimony to support the picture

8    of the changing portrait he allegedly made in about 1990; at deposition, he said that Kodak helped him

9    produce this portrait while at trial he said that his uncle referred him to someone in advertising (not

10   Kodak) to help him create the portrait.  Plaintiff also offered the testimony of Roy Taylor, a former

11   Senior Project Engineer for Kodak, who said in 1990 Kodak did not produce lenticulars for outside

12   parties.  Third, while the press release about the Long Beach Haunted house appears credible, it does not

13   mention Defendant's business, The Ghoulish Gallery.  The Court will not give any weight to the undated

14   flyer regarding the Long Beach haunted house because its information regarding the price and admission

15   time conflicts with the contents of the press release, and the flyer does not provide any dates for the

16   haunted house.  Neither will the Court give weight to the journal entries because the journal's author,

17   Plaintiff's mother, did not testify as to how she kept her journal, the handwriting differs from page to

18   page for some of the relevant entries, and the last relevant entry is undated and not followed by any other

19   dated entries, so the Court cannot identify when it was written.

20       As for Plaintiff's claim based on Defendant's alleged fabrication of customer feedback on The

21   Ghoulish Gallery website, Plaintiff did not present sufficient evidence of fabrication.  In fact, customer

22   Carrie Vines, the one trial witness who provided feedback on Defendant's website, testified that she

23   personally wrote that feedback.

24       **b.    Defendant's Liability for False Advertising.**

25       Given Plaintiff's proffered evidence that Defendant falsely advertised that The Ghoulish Gallery

26   had been in the business of creating changing portraits since 1995, and Defendant's failure to provide

27   credible evidence to rebut it, Plaintiff has met his burden of showing that Defendant's promotional

28   statement about his changing portraits either was false, or at the very least misled, confused or deceived

13

1   consumers. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1140 (9th Cir. 1997) (stating

2   that relief is available under the Lanham Act even if an advertisement is not literally false but rather

3   misleads, confuses or deceives consumers).

4         First, Plaintiff has shown that Defendant posted the advertisement on the main page of several

5   versions of his website. [*See, e.g.,* Trial Exs. 103-1, 120-1, 249-1, 250-1.] Defendant also said himself

6   that as of 2005, he had been in business for 13 years. [Admitted Fact No. 40.] And, because Defendant

7   sold these portraits over the internet and at conventions nationwide, he caused them to enter interstate

8   commerce. Next, Defendant's advertisement had the tendency to deceive all those who looked at the

9   website because it was posted as the first few words on the website's main page. This deception was

10  material because, with only four known competitors in the market place,[12] if a customer was deciding

11  among the different changing portraits companies–and one company had been in the business since 1995

12  and while another had sold portraits since only 2003–all else being equal, a buyer would likely go with

13  the company that had been in the business longer. This material deception either has been or is likely to

14  lessen the goodwill of Plaintiff's products.

15        In sum, Defendant was out of the changing portrait business from 1996 to at least the year 2000,

16  or later. Also, according to the emails Defendant sent to Plaintiff in July 2004, one can infer that

17  Defendant had not previously been in the business of creating changing portraits using lenticular

18  technology. Plaintiff has met his burden to prove all the required elements of a false advertising claim

19  under the Lanham Act and is entitled to damages for this claim.

20          **c.**    **Plaintiff's Damages for False Advertising.**

21        A plaintiff who successfully establishes a claim for false advertising under the Lanham Act may

22  recover, "subject to the principles of equity . . . (1) defendant's profits, (2) any damages sustained by the

23  plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). An inability to show actual damages

24  does not preclude relief under this section; the "publication of deliberately false comparative claims

25  gives rise to a presumption of actual deception and reliance." *Southland Sod Farms,* 108 F.3d at 1145-

26

27       [12]In addition to Haunted Memories and The Ghoulish Gallery, the parties' primary competitors

28  are Norm Lanier with his business, Haunted Portraits (*see* Trial Ex. 110-2), and Morbid Industries, which produces Gortraits (*see* Trial Ex. 166-1).

1    46 (internal quotations omitted).  The court can "fashion relief, including monetary relief, based on the

2    totality of the circumstances" and should consider compensation for the plaintiff's losses or the

3    defendant's unjust enrichment and not simply a penalty for the defendant.  *Id.* (internal citations

4    omitted). Regarding injunctive relief, "a competitor need not prove injury when suing to enjoin conduct

5    that violates section [section 1117]."  *Id.* (internal quotations omitted).

6         Based on Plaintiff's evidence and Defendant's failure to rebut it with credible evidence, Plaintiff

7    is entitled to the presumption of actual consumer deception and reliance and consequently, monetary

8    damages for this claim.  While Plaintiff has not presented evidence of actual lost sales, the Court, using

9    the equitable power granted under 15 U.S.C. § 1117(a), finds that Plaintiff is entitled to damages in the

10   amount of $ 2,500 as compensation for Defendant's false advertisements that The Ghoulish Gallery has

11   been in the changing portrait business since 1995.

12        Plaintiff is also entitled to injunctive relief.  Therefore, Defendant must remove any statement

13   from his website that states The Ghoulish Gallery has been in the changing portrait business since 1995.

14   Defendant may advertise that The Ghoulish Gallery has been in the changing portrait business for a

15   certain number of years, or since a date certain, if he can, if required, establish proof of that date with

16   sufficient evidence.

17        **3.    Defendants' Counterclaim for False Advertising.**

18        Defendant claims Plaintiff engaged in false advertising with these two statements:

19             I've had a good run these past two years as the ORIGINATOR of Spooky
               Changing Portraits based on antique photo images. [Trial Ex. 166-1.]
20             [Emphasis in original.]

21             Let there be no confusion.  "Haunted Memories Changing Portraits" was
               the first to take antique photographs, create scary transforming images, and
22             offer them as a successful line of products.  NOBODY was in this business
               selling this particular product before I was.  I can PROVE IT with facts,
23             not with hot air!  I would never make this claim if it were not true!  [Trial
               Ex. 163-4.]  [Emphasis in original.]
24

25        Plaintiff posted the first statement on the Haunted Attraction message board and posted the

26   second on his website.  Defendant argues that Plaintiff's claim as the originator of this type of product is

27   false because Plaintiff admitted (1) he did not invent changing portraits [Admitted Fact. No. 58]; and (2)

28   "The concept of a changing portrait is more than a century old" [Admitted Fact No. 59; *see also* Roy

15

1   Taylor Testimony].  Defendant, however, did not offer any credible evidence that either he or others had

2   made changing portraits based on antique photographs before Plaintiff did.  First, Defendant's

3   photocopied page of an antique photo that he said he made into a changing portrait in the 1990s does

4   not, on its own, prove Defendant predated Plaintiff in this business.  Next, while Defendant argues that

5   both parties are influenced by Disney's Haunted Mansion, and submitted evidence of some of Disney's

6   products and images, Defendant does not offer evidence that Disney's changing portraits use antique

7   photographs.  [*See, e.g.,* Trial Exs. 198-1 to 198-11 and 240-242].

8       While Plaintiff admits that he did not invent the concept of "changing portraits," he never

9   conceded that he was not the first to create changing portraits based on the use of antique photos.  In

10  reviewing images from Plaintiff's website, as of 2003, Plaintiff was taking antique photos and using

11  them to create his haunted, changing portraits.  Defendant presented no evidence to contradict that

12  Plaintiff was the first to make changing portraits using antique photos.  Based on the evidence before the

13  Court, Plaintiff's statements that he was the "originator" of changing portraits based on the use of

14  antique photo images does not appear false nor likely to mislead, confuse or deceive customers.

15  Defendant, therefore, does not prevail on his counterclaim for false advertising.

16  **C.    Counterclaim for False or Misleading Statements.**

17      It is unlawful for any person or entity "with intent directly or indirectly to dispose of . . . personal

18  property . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate

19  . . . in any . . . advertising device . . . any statement, concerning that . . . personal property . . . which is

20  untrue or misleading . . . ."  Cal. Bus. & Prof. Code § 17500.  This false advertising law prohibits not

21  only false advertising, "but also advertising which[,] although true, is either actually misleading or which

22  has a capacity, likelihood or tendency to deceive or confuse the public."  *Laster v. T-Mobile USA, Inc.,*

23  407 F. Supp. 2d 1181, 1193 (S.D. Cal. 2005) (citation omitted).  For the same reasons outlined in section

24  B above, the Court denies Defendant's counterclaim for false or misleading statements under state law.

25  **D.    Unfair Competition.**

26      **1.    California Common Law.**

27      Common law unfair competition "is normally invoked in an effort to protect something of value

28  not otherwise covered by patent or copyright law, trade secret law, breach of confidential relationship, or

16

1  some other form of unfair competition." *City Solutions v. Clear Channel Commc'ns., Inc.*, 365 F.3d

2  835, 842 (9th Cir. 2004) (internal quotations omitted).  In California this tort has four elements: (1) the

3  plaintiff invested substantial time, skill or money in developing its property; (2) the defendant

4  appropriated and used the property at little or no cost; (3) the plaintiff did not authorize or consent to the

5  property's appropriation and use; and (4) the plaintiff was injured by the appropriation and use.  *Id.*

6  Common law unfair competition is considered either synonymous with "passing off" one's goods as

7  those of another, or analogous to passing off, by selling products confusingly similar to a competitor's

8  products so as to exploit the competitor's reputation in the market.  *Southland Sod Farms*, 108 F.3d at

9  1147.  "Passing off" violates both common law unfair competition and unfair competition under the

10  Lanham Act.  *Smith*, 648 F.2d at 604.

11       **2.**    **The Parties' Claims for Common Law Unfair Competition.**

12       Plaintiff claims that Defendant engaged in unfair competition by using the words "haunted

13  memories" in the metatags for his website; posting a written attack on Plaintiff on The Ghoulish Gallery

14  website and accusing Plaintiff of copying and being dishonest and unprofessional; threatening Plaintiff

15  in an email to him; fabricating customer feedback on his own website and writing a false review that

16  Plaintiff's works were inferior; and directly contacting Plaintiff's potential and prior customers and

17  vendors.  The Court finds that Plaintiff did not prove his claim for unfair competition because none of

18  these actions amount to "passing off," where Defendant took Plaintiff's products and used them without

19  his consent.

20       Defendant claims Plaintiff engaged in unfair competition by harassing Defendant's customers

21  and making disparaging remarks to them and industry professionals; threatening legal action against

22  people who favored Defendant's products; interfering with Defendant's business by posing as a fake

23  customer; and trying to confuse his products with Defendant's.  As explained in section B above,

24  Defendant did not prove his unfair competition counterclaim based on similarity of products because no

25  facts indicate that Plaintiff tried to "pass off" his products as Defendant's or sell Defendant's products

26  under his name.  Neither does Defendant prevail on this counterclaim based on his other allegations

27  because none of them involve Plaintiff taking Defendant's products and using them without permission.

28       In short, neither party prevails on their respective claims for common law unfair competition.

06cv371 NLS

1  E.     **Unfair Business Practices.**

2          1.     **Cal. Bus. & Prof. Code §§ 17200 et seq.**

3          California's unfair competition law ("UCL") prohibits any "unlawful, unfair or fraudulent

4  business practice." Cal. Bus. & Prof. §§ 17200 et seq. The "unlawful" prong of the UCL proscribes

5  "anything that can properly be called a business practice and that at the same time is forbidden by law."

6  *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 717-718 (2001) (internal quotations

7  omitted). The UCL "borrows" these "violations of other laws and treats them as 'unlawful' practices

8  independently actionable under the unfair competition law." *Id.* at 718. To decide whether a practice is

9  unfair, a court determines whether "the gravity of the harm to the victim outweighs the utility of the

10  defendant's conduct." *People ex rel. Renne v. Servantes*, 86 Cal. App. 4th 1081, 1095 (2001). A

11  business practice is "fraudulent" if "members of the public are likely deceived." *Comm. on Children's*

12  *Television v. Gen. Foods. Corp.*, 35 Cal. 3d 197, 224 (1983).

13          A plaintiff can obtain injunctive relief and/or restitution for a UCL violation. Cal. Bus. & Prof.

14  §§ 17203; *Mathews v. Gov't Employees Ins. Co.*, 23 F. Supp. 2d 1160, 1165 (S.D. Cal. 1998).

15          2.     **Plaintiff's Claim for Unfair Business Practices.**

16          Plaintiff bases his claim for unfair business practices on the same claims he makes for false

17  advertising and unfair competition. Of these claims, Plaintiff only prevailed on his claim that Defendant

18  has been falsely advertising that The Ghoulish Gallery has been in business since 1995. Based on the

19  Court's finding that this is a false advertisement, the Court finds that Defendant's act of advertising that

20  The Ghoulish Gallery has been in business since 1995 is also an unfair business practice. Plaintiff is

21  thus entitled to the same injunctive relief as outlined in section B.2.c. above.

22  F.     **Intentional Interference with Prospective Economic Advantage.**

23          1.     **Governing Law.**

24          To show interference with prospective economic advantage one must prove:

25                  1) an economic relationship between plaintiff and a third party, with the
                    probability of future economic benefit to the plaintiff, 2) defendant's
26                  knowledge of the relationship, 3) intentional acts by the defendant
                    designed to disrupt the relationship, 4) actual disruption of the
27                  relationship, and 5) proximately caused economic harm to the plaintiff.

28  *Milne Employees Ass'n v. Sun Carriers*, 960 F.2d 1401, 1411-12 (9th Cir. 1991). To prevail on such a

1    claim, the plaintiff must prove "an act that is wrongful independent of the interference itself." *CRST*

2    *Van Expedited, Inc. v. Werner Enters.*, 479 F.3d 1099, 1108 (9th Cir. 2007).  Acting with an improper

3    motive does not constitute an independent, wrongful act.  *Korea Supply Co. v. Lockheed Martin Corp.*,

4    29 Cal. 4th 1134, 1158 (2003).  Rather, an independently wrongful act must be "unlawful, that is, . . .

5    proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal

6    standard." *Id.* at 1159 (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 408

7    (1995) (Mosk, J., concurring) ("It follows that the tort may be satisfied by intentional interference with

8    prospective economic advantage *by independently tortious means*")).

9        **2.     Plaintiff's Claim for Intentional Interference.**

10       .  Plaintiff asserts all the facts stated in his claim for unfair competition in support of his claim for

11   intentional interference with prospective economic advantage.  The only factual claims the Court finds

12   possibly relevant here are Defendant's contact with Plaintiff's potential and prior customers and vendors,

13   namely, Carrie Vines, Roy Brashears and Chris Russell.

14       Carrie Vines purchased products from Plaintiff first and praised him for his work. [*See* Trial Exs.

15   16-15, 16-20.] Later, she bought changing portraits from Defendant and posted positive feedback on

16   Defendant's website. [Trial Ex. 85-1.] Vines testified that she was the first to contact Defendant

17   regarding his work, bought one of his portraits and then provided feedback for his website.  Defendant

18   did not disrupt Vines' relationship with Plaintiff, and therefore, Plaintiff has no claim for intentional

19   interference with his customer relationship with Carrie Vines.

20       Plaintiff complained that Defendant disrupted his established business relationship with Roy

21   Brashears, a vendor who sold Plaintiff's changing portraits through Haunted Ventures FX.  After

22   Plaintiff found out Brashears was also selling changing portraits from a competitor, Norm Lanier of

23   Haunted Portraits, Plaintiff wrote Brashears an email on January 28, 2005 and demanded that Brashears

24   not sell Lanier's products anymore.  Plaintiff explained to Brashears:

25           I am not mad at <u>you</u> - just upset about the situation.
                 ***
26           The problem is that Norm has ripped off my entire concept (he has
             publicly admitted that my site was his "inspiration").  Over the past six
27           months, he has devalued the market for spooky changing portraits
             significantly by virtue of the fact that he sells smaller versions, charges
28           less, and offers what I feel are substandard designs.  I don't want there to

1   be any chance of buyer confusion between our products.

2   Consequently I will not do business with anyone who supports or aids him.
    As long as his stuff remains on your site I cannot fill any order you may
3   get for my product.

4   [Trial Ex. 188-1; Allen Testimony, Day 3, Cross-Examination.] [Emphasis in original.]

5   On March 26, 2005, Brashears wrote to Plaintiff and informed him he was removing Plaintiff's

6   products from the Haunted Ventures FX website "NOT based on the quality of your work . . . [but]

7   based on . . your . . . condemn[ation of] your competition and the merchandise that he produces." [Trial

8   Ex. 189-2.] Consequently, Brashears carried Defendant's and Lanier's changing portraits. Plaintiff did

9   not prove Defendant interfered with Plaintiff's relationship with Brashears. Rather, Plaintiff himself

10  appeared to disrupt his own relationship by giving Brashears an ultimatum and demanding that he either

11  not offer multiple choices to his customers, or risk having orders go unfilled.

12  Finally, Plaintiff complains that Defendant disrupted his potential relationship with vendor Chris

13  Russell. At trial, Russell testified that he never met Plaintiff or Defendant before the Ironstock trade

14  show in June 2005. Russell explained that Plaintiff contacted him a few times in June 2005 and asked

15  him to put Plaintiff's products "in Tim[ ] [Turner's] face" at the Ironstock show. Russell was put off by

16  his communications with Plaintiff and never agreed to display or sell his products. Russell did not meet

17  Defendant until the actual Ironstock show. While Plaintiff successfully impeached Russell's testimony

18  by presenting two emails from Russell to Plaintiff in September and October 2004 praising Plaintiff's

19  work, Plaintiff never presented any other evidence that Defendant knew of his relationship with Russell

20  and somehow interfered with it.

21  **3.    Defendant's Counterclaim for Intentional Interference.**

22  Defendant asserts all the facts stated in his claim for unfair competition in support of his claim

23  for intentional interference with prospective economic advantage. The Court finds the most plausible

24  factual bases for this claim to be based on Defendant's relationships with customers Carrie Vines and

25  Jessica Zemeck.

26  Plaintiff learned from Defendant's website that Defendant established a relationship with

27  Plaintiff's former customer, Carrie Vines. [Trial Ex. 85-1.] Plaintiff then sent Vines an email asking

28  whether she actually wrote the feedback posted on The Ghoulish Gallery website, and she responded that

1   she did. [Trial Ex. 85-4.]  He also called her to talk about the feedback. [Vines Testimony.]  Plaintiff

2   then took his case "public" and posted on the Haunted Attraction message board the entire email

3   correspondence detailing his transaction with Vines and commenting that she "mysteriously decided to

4   trash me on my competitor's website" and wondered why she "turn[ed] against me so viciously." [Trial

5   Ex. 157-1.]  He even posted comments about her on his website. [Vines Testimony.]  Even assuming

6   that Plaintiff intended to disrupt Vines' relationship with Defendant, Vines maintained, through her

7   testimony, that she thought Defendant produced a better changing portrait than Plaintiff.  Thus, there is

8   no evidence that Plaintiff actually disrupted Vines' customer relationship with Defendant.

9         Finally, Defendant claims that Plaintiff interfered with an economic relationship with potential

10  customer Jessica Zemeck.  Zemeck attended a haunt convention, Horrorfind Weekend, in 2006, where

11  she saw both Plaintiff's and Defendant's products for the first time.  Zemeck first spoke to Plaintiff at

12  his booth and asked him what the difference was between his products and Defendant's.  Plaintiff said

13  that his products had extra stages of animation, but then focused his conversation on portraying

14  Defendant as a liar.  Zemeck testified that Plaintiff said something to the effect of "Turner will tell you

15  he came up with the idea first, but he's lying," and that "Turner has launched a huge smear campaign

16  against me."  Zemeck thought this was "weird" because it was not a good sales approach, and decided to

17  not purchase from either Plaintiff or Defendant because she did not feel comfortable.  She testified that

18  Defendant said nothing negative about Plaintiff.

19        Defendant has shown–through a reasonable inference of Zemeck's testimony–that he had an

20  economic relationship with Zemeck, an attendee at Horrorfind Weekend, with the probability of

21  receiving a future economic benefit.  Plaintiff testified that he thought Zemeck came over from

22  Defendant's "camp," and said disparaging comments about Defendant to Zemeck.  Because of Plaintiff's

23  comments, Zemeck did not purchase from Defendant, which caused economic harm to him.  While

24  Plaintiff may have said disparaging remarks about Defendant that directly influenced Zemeck's decision

25  to not purchase Defendant's products, those comments do not arise to an "independently wrongful act"

26  that is "proscribed by some constitutional, statutory, regulatory, common law, or other determinable

27  legal standard."  Therefore, Defendant does not prevail on his claim for intentional interference with

28  prospective economic advantage.

1    **G.**    <u>**Trade Libel**</u>.

2      **1.**    <u>**Governing Law**</u>.

3      Under California law, "trade libel is an intentional disparagement of the quality of property,

4 which results in pecuniary damage." *Aetna Casualty & Surety Co. v. Centennial Ins. Co.*, 838 F.2d 346,

5 351 (9th Cir. 1988)(internal quotations omitted). Trade libel is distinct from defamation:

6         It is more akin to unfair competition. Trade libel and product
disparagement are injurious falsehoods that interfere with business. Unlike

7         classic defamation, they are not directed at the plaintiff's personal
reputation but rather at the goods a plaintiff sells or the character of his

8         other business.

9 *Id.* (internal citations omitted); *see Microtec Research v. Nationwide Mut. Ins. Co.*, 40 F.3d 968, 972 (9th

10 Cir. 1994).

11      To prove trade libel, Plaintiff must show (1) a statement that (2) was false, (3) disparaging the

12 quality of the plaintiff's property, (4) published to others in writing, (5) induced others not to deal with

13 plaintiff, and (6) caused special damages. *New.Net, Inc. v. Lavasoft*, 356 F. Supp. 2d 1090, 1113 (2004)

14 (internal citations omitted). Regarding special damages, "bare allegation of the amount of pecuniary loss

15 is insufficient for the pleading of a trade libel claim." *Id.* (finding no special damages where the

16 complaint did not specify an amount of damage) (internal quotations omitted). If the plaintiff alleges

17 special damages based on a general loss of customers, the plaintiff should prove:

18         facts showing an established business, the amount of sales for a substantial
period preceding the publication, the amount of sales subsequent to the

19         publication, [and] facts showing that such loss in sales were the natural
and probable result of such publication.

20

21 *Id.*

22      **2.**    <u>**Plaintiff's Claim for Trade Libel**</u>.

23      Plaintiff asserts all the facts stated in his claims for false advertising and unfair competition as

24 the predicates for his trade libel claim. The Court finds the most plausible factual basis for Plaintiff's

25 trade libel claim to be Defendant's website posting about Plaintiff on or around October 2004. [Trial Ex.

26 39.] In the posting, Defendant never refers to Plaintiff by name, but says:

27         What's up with that other site that claims they were the first one with the
Changing Portraits?

28

. . . Recently, one of the copycat sites alleged, "Since launching my website in May 2003, I've been imitated twice now (Yes, I was the FIRST, folks - don't you believe anything different!)" This individual asks potential customers to believe him when he alleges that he was the first. Yet in the previous sentence, he admits that his company was launched in 2003. The Ghoulish Gallery was started in 1992 - a full twelve years earlier!

One has to wonder what else someone like this might be lying about? The quality of their work? Their return policies? Perhaps even their customer feedback? . . . As for our own credibility, one of the very first things you see on our homepage is an IMDb link that allows you to verify that The Ghoulish Gallery owner is who he says he is. From this one example alone, you should be able to determine who is being honest with their customers and who is not.

While Defendant's published statement disparages the quality of Plaintiff's products, it is not sufficiently factual to be proved right or wrong. Further, Plaintiff did not show that Defendant's statements induced others not to deal with him or caused him special damages. For example, Plaintiff did not show his sales numbers before and after the publication, and did not prove that the statement caused any alleged decline in sales. Therefore, Plaintiff does not prevail on his trade libel claim.

### 3.   Defendant's Counterclaim for Trade Libel.

Defendant claims that these three statements make Plaintiff liable to him for trade libel: (1) following customer feedback that said Plaintiff's competitor's products were not of "the same quality," Plaintiff wrote, "Eddie's Note: This fellow is referring to the work of 'Dim Terder' - name withheld to protect the mediocre. . . . Needless to say, I do not endorse the 'Fhoulish Fallacy' in any way . . . [Trial Ex. 177-1]; (2) Plaintiff's posting on the Haunted Attraction message board where he said, "Hurry Tim, Hurry!  Slash those prices! . . . Yes, the Gortraits will probably hurt my business, but I don't care. . . . The copycats can now all fight it out amongst themselves." [Trial Ex. 166-1]; and (3) "Let me be clear - I do not like my competition. . . . [I]n my opinion they are unabashed a**holes" [Trial Ex. 164-1].

The first statement, where Plaintiff refers to Defendant as "mediocre," is probably better characterized as a subjective opinion rather than a definitive statement, since the word "mediocre" would be difficult to prove true or false. If one reads the next statement as saying Defendant is a "copycat," while Defendant successfully rebutted the claim for copyright infringement as to Plaintiff's protected work, he did not necessarily prove that he was not a "copycat" of Plaintiff's unprotected work. Finally, Plaintiff identifies the third statement as his opinion. Even if these statements were false, Defendant sets

1   forth no proof that they induced others not to deal with Defendant or caused him special damages.  Thus,

2   Defendant does not prevail on his counterclaim for trade libel.

3   **H.   Defamation.**

4           **1.   Governing Law.**

5           Defamation "involves the intentional publication of a statement of fact that is false, unprivileged,

6   and has a natural tendency to injure or which causes special damage." *Smith v. Maldonado*, 72 Cal. App.

7   4th 637, 645 (1999).  Defamation is effected by libel or slander.  Cal. Civ. Code § 44.  "Libel is a false

8   and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or

9   obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his

10  occupation."  Cal. Civ. Code § 45.  Libel per se excludes the need to prove special damages:

11  "[Damage] to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of

12  actual damages in order to obtain or sustain an award of damages including, in an appropriate case,

13  punitive damages." *Barnes-Hind v. Superior Court*, 181 Cal. App. 3d 377, 382 (1986) (citation omitted).

14          **2.   Defendant's Defamation Counterclaim.**

15          Defendant claims that Plaintiff posted a statement on a public message board that constitutes

16  libel per se because it implies Defendant has a diagnosable mental disorder.  [Ex.181-2] The alleged

17  defamatory statement is part of a series of posts that appear on the Haunted Attractions message board

18  between October 16 and 19, 2006.  Plaintiff began the post on October 16, 2006, when he let readers

19  know his 5" x 7" changing portraits were now being offered for sale at Knott's Berry Farm.  Defendant

20  responded, explaining that while Plaintiff's smaller changing portraits were being sold in the gift shop at

21  Knotted's Berry Farm, they were not being "featured" there like Defendant's larger-sized 16" x 20"

22  changing portraits.  Plaintiff then responded with the post claimed to be defamatory.  It reads:

23          "Hyper competitiveness"

24          Tim,

25          Thanks for stepping on my post to regurgitate old news about yourself.  If
        you recall, I did not interfere with your post last year when you boasted

26          about getting your work in their maze (Knotted's Berry Farm), so why
        must you interfere with this post about my good fortune with Knotted?

27          There's enough room in their park (and at trade shows and in this industry)
        for both of us.  Why can't you be gracious about it and leave it alone? . .

28

1           On a related note, the following excerpt is from "Competition Freaks"-an

2           article written by Marianne Szededy-Maszak which appeared in the L.A. Times in 2005.

3           "Today, a broad array of recent psychological research has led some researchers to conclude that hyper-competitiveness resembles a

4           diagnosable mental disorder - -a volatile alchemy of obsessive compulsiveness, narcissism, neurosis and sometimes a dose of paranoia.

5

6           Psychologists have even linked the hypercompetitive personality to such seemingly disparate conditions and behaviors as road rage, drunk driving,

7           eating disorders, addiction and depression.

8           It's a style and temperament that affects all other relationships and which, over time, becomes fundamentally impairing, causing fractured families,

9           social isolation and even the disintegration of careers."

10          To find out more about this pathetic and destructive condition, I encourage everyone to print out and read the full article when you have time -it's

11          fascinating.

12      Defendant maintains that the only conclusion readers could draw from this "hypercompetitive"

13 post is that Plaintiff is publicly accusing Defendant of being hypercompetitive and thus having a

14 diagnosable mental disorder. The syllogism on which Defendant relies is (1) Hyper competitiveness

15 constitutes a diagnosable mental disorder, (2) Defendant is hypercompetitive, (3) therefore, Defendant

16 has a diagnosable mental disorder. Plaintiff protests this interpretation, claiming his post did not refer to

17 Defendant, just to the fact that the industry is incredibly competitive. Plaintiff also maintains the

18 statement is one of opinion, not fact, so it is protected speech.

19      Language can be libelous on its face even if it is also susceptible of an innocent meaning.

20 *MacLeod v. Tribune Publishing Co.*, 52 Cal. 2d 536, 549 (1959). The test is whether the defamatory

21 meaning can be discerned by the reader without explanatory matter. *Id.*

22          [I]f the reader would be able to recognize the defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances,

23          extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then . . . the libel cannot

24          be libel per se but will be libel per quod.

25 *Barnes-Hind*, 181 Cal. App. 3d at 387. Two witnesses at trial, Scott Broad and Karen Murphy, testified

26 that they read the "hypercompetitive" post and thought it referred to Defendant. Notably, both Broad

27 and Murphy were already aware of the bad blood between Plaintiff and Defendant before these posts

28 were written. Neither testified they took the hypercompetitive statement to mean Defendant has a

06cv371 NLS

1  diagnosable mental disorder.  Significantly, the posts that follow the hypercompetitive post suggest that

2  readers generally felt the competition between these rivals had just gone too far, for example:

3        Eddie made good. So did Tim. Each are talented. Why piss on another's
         parade? Co-exist quietly.  Life will be much brighter. [Uncle Creepy, Trial
4        Ex. 181-3, 181-10]

5        Let's all try to get along. [Jonathon, Trial Ex. 181-4, 181-11]

6        . . . there has been fuel to this fire for some time and us posting post after
         post just keeps adding to it.  I believe there is more to every story.  There
7        is Eddie's side, Tim's side and a lot of all of us no [sic] nothing about.  I
         actually love and use both products. . .I'm a happy customer of both
8        products. [Tyler Barnett, Trial Ex. 181-13]

9        What I don't approve of is the poor sportsmanship and very poor business
         conduct that was displayed.  Personally, I think both products look good.
10       Unfortunately, I just don't believe openly trying to hurt a rival is good for
         business. [Johnmusic, Trial Ex. 181-15]

11

12        Even assuming readers took Plaintiff's post as referring to Defendant in such a way that it could

13  constitute libel per se, not all injurious statements are libelous.  For example, statements of opinion are

14  generally not actionable unless the opinion is based upon declared or implied facts that are capable of

15  being proven right or wrong.  *Ruiz v. Harbor View Comty. Ass'n.*, 134 Cal. App. 4th 1456, 1471 (2005).

16  Here, the accused statement that "some researchers conclude that hyper-competitiveness resembles a

17  diagnosable mental disorder" necessarily implies that other researchers do not so conclude. Thus the first

18  assumption in the syllogism, namely "Hyper competitiveness resembles a diagnosable mental condition"

19  is not sufficiently factual to be proven right or wrong.  The second assumption, Defendant is

20  hypercompetitive, is likewise not sufficiently factual to be proven right or wrong.  To the extent that

21  readers thought Plaintiff's statement accused Defendant of having a mental disorder, that statement can

22  only be viewed as an opinion.  Thus, Defendant's defamation counterclaim fails.

### CONCLUSION

24        Based on the foregoing, the Court rules as follows:

25        1.      Plaintiff's claim for copyright infringement is **DENIED**;

26        2.      Plaintiff's claim for unfair competition under the Lanham Act in the form of false

27                advertising is **GRANTED** with respect to Defendant's advertisements that he has been in

28                business since the 1990s, and Plaintiff is entitled to monetary and injunctive relief as

explained in section B above;

3.    Defendant's counterclaim for unfair competition under the Lanham Act is **DENIED**;

4.    Defendant's counterclaim for false or misleading statements under California law is **DENIED**;

5.    Plaintiff's claim and Defendant's counterclaim for common law unfair competition are **DENIED**;

6.    Plaintiff's claim for unfair business practices is **GRANTED**;

7.    Plaintiff's claim and Defendant's counterclaim for intentional interference with prospective economic advantage are **DENIED**;

8.    Plaintiff's claim and Defendant's counterclaim for trade libel are **DENIED**;

9.    Defendant's counterclaim for defamation is **DENIED**.

The Clerk is hereby directed to enter judgment (1) in favor of Plaintiff and against Defendant for Plaintiff's claims for false advertising under the Lanham Act and for unfair business practices under California's Business and Professions Code sections 17200 *et seq.*; (2) against Plaintiff and in favor of Defendant for Plaintiff's claims for copyright infringement, common law unfair competition, intentional interference with prospective economic advantage and trade libel; and (3) in favor of Plaintiff and against Defendant for Defendant's counterclaims for false advertising under the Lanham Act, false or misleading statements under state law, common law unfair competition, intentional interference with prospective economic advantage, trade libel and defamation.

**IT IS SO ORDERED.**

Dated: _11-20-07_

NITA L. STORMES
United States Magistrate Judge

06cv371 NLS

1

**APPENDIX**

2   **Findings of Fact.**[1]

3        1.    Plaintiff launched the website for his business "Haunted Memories Changing Portraits" in

4             April 2003.

5        2.    In July 2004, Defendant sought advice from Plaintiff regarding details of how Plaintiff

6             produces his changing portraits and questions about Plaintiff's business.

7        3.    Defendant created the website for his business "The Ghoulish Gallery" in October 2004.

8        4.    In December 2004, Plaintiff obtained a federally registered copyright for his "Haunted

9             Memories Changing Portraits" website.

10       5.    Defendant advertised on his website that The Ghoulish Gallery has been in business since

11            1995.

12       6.    Defendant admitted that he was not in the changing portrait business from December

13            1996 to 2000, 2001 or 2002.

14       7.    Defendant did not present affirmative evidence that The Ghoulish Gallery had been in

15            business since 1995.

16       8.    Plaintiff advertised that he was the originator of spooky changing portraits based on

17            antique photo images.

18       9.    Defendant did not provide credible evidence that he, Disney or any other producer created

19            changing portraits using antique photo images before Plaintiff did.

20       10.   Plaintiff did not take Defendant's goods and pass them off as his own.

21       11.   Defendant did not take Plaintiff's goods and pass them off as his own.

22       12.   Carrie Vines purchased a changing portrait from Plaintiff and was happy with it.

23       13.   Vines had a seller-customer relationship with Plaintiff.

24       14.   Vines then found Defendant's website and purchased a changing portrait from him.  She

25            liked Defendant's work better than she liked Plaintiff's work.

26       15.   Vines wrote the customer feedback posted on Defendant's website.

27

28  [1] Any conclusion of law that is deemed to be a finding of fact is incorporated in this section by reference.

06cv371 NLS

16.    Vines had a seller-customer relationship with Defendant.

17.    Roy Brashears sold Plaintiff's products on his website, Haunted Ventures FX.  Brashears also sold Norm Lanier's products on his website at around the same time.

18.    Plaintiff demanded that Brashears no longer sell Lanier's products, or else Plaintiff would not fulfill any orders for Brashears.

19.    Plaintiff and Chris Russell had a potential vendor-vendee relationship.

20.    Defendant had a potential seller-customer relationship Jessica Zemeck.

21.    Zemeck spoke to Plaintiff before she spoke to Defendant.

22.    Plaintiff told Zemeck that Defendant was a liar and that Defendant had launched a huge smear campaign against Plaintiff.

23.    Zemeck did not buy anything from Plaintiff or Defendant because based on her conversation with Plaintiff, she did not feel comfortable purchasing from either one of them.

24.    Defendant published a statement of opinion on his website on or around October 2004 impugning the quality of Plaintiff's work.

25.    Plaintiff published three disparaging statements about Defendant or the quality of his work.

26.    Plaintiff posted a message on the Haunted Attraction message board that included a quote from an article entitled "Competition Freaks" that said "some researchers . . . conclude that hyper-competitiveness resembles a diagnosable mental disorder."

**Conclusions of Law.[2]**

**A.  Copyright Infringement.**

1.    Plaintiff is entitled to copyright protection in the selection, arrangement and presentation of the contents of his website as it appeared in December 2004.

2.    Defendant had access to Plaintiff's work because Plaintiff's website was publicly available on the internet.

---

[2] Any finding of fact that is deemed to be a conclusion of law is incorporated in this section by reference.

06cv371 NLS

3.   There is no substantial similarity between Plaintiff's website as it appeared in December 2004 and Defendant's website as it appeared in April 2005, October 2005, January 2006 and June 2006.

4.   Defendant did not infringe Plaintiff's federally copyright-protected website.

**B.   False Advertising Under Federal and State Law.**

5.   Defendant's statement that The Ghoulish Gallery had been in the business of creating changing portraits since 1995 (the "1995 advertisement") was false, or at the very least misled, confused or deceived consumers.

6.   The 1995 advertisement had the tendency to deceive all those who looked at the website because it was posted as the first few words on the website's main page.

7.   The 1995 advertisement was material, as it was likely to influence a buyer's decision when compared to a competitor who had only been in business since 2003.

8.   Defendant caused the goods sold by The Ghoulish Gallery to enter interstate commerce.

9.   The 1995 advertisement has been, or is at least likely to have lessened the goodwill of Plaintiff's products.

10.   Defendant is liable to Plaintiff under the Lanham Act for the false 1995 advertisement.

11.   Plaintiff is entitled to damages in the amount of $ 2,500 as compensation for the 1995 advertisement.

12.   Plaintiff is entitled to injunctive relief for the 1995 advertisement.  Defendant may advertise that The Ghoulish Gallery has been in the changing portrait business for a certain number of years, or since a date certain, if he can, if required, establish proof of that date with sufficient evidence.

13.   Defendant is not liable to Plaintiff for false designation under the Lanham Act.

14.   Plaintiff's advertisement that he was the originator of spooky changing portraits based on antique photo images is not false nor likely to mislead, confuse or deceive customers.

15.   Plaintiff is not liable to Defendant under the Lanham Act for false advertising.

16.   Plaintiff is not liable to Defendant under Cal. Bus. & Prof. Code § 17500 for false advertising.

06cv371 NLS

**C.    Common Law Unfair Competition.**

    17.    Plaintiff is not liable to Defendant for false designation under common law unfair competition.

    18.    Defendant is not liable to Plaintiff for false designation under common law unfair competition.

**D.    Unfair Business Practices.**

    19.    Defendant is liable to Plaintiff for unfair business practices based on the 1995 advertisement.

    20.    Plaintiff is entitled to the same injunctive relief under this claim as the Court has ordered for the 1995 advertisement.

**E.    Intentional Interference with Prospective Economic Advantage.**

    21.    Defendant did not actually disrupt Plaintiff's relationship with Carrie Vines.

    22.    Defendant did not actually disrupt Plaintiff's relationship with Roy Brashears.

    23.    Defendant did not actually disrupt Plaintiff's relationship with Chris Russell.

    24.    Plaintiff did not actually disrupt Defendant's relationship with Carrie Vines.

    25.    Defendant is not liable to Plaintiff for intentional interference with prospective economic advantage.

    26.    Defendant had an economic relationship with Zemeck with the probability of receiving future economic benefit.

    27.    Plaintiff knew of Defendant's economic relationship with Zemeck.

    28.    Plaintiff intended to disrupt Defendant's economic relationship with Zemeck.

    29.    Plaintiff actually disrupted Defendant's economic relationship with Zemeck.

    30.    Plaintiff proximately caused economic harm to Defendant.

    31.    Plaintiff's disparaging comments to Zemeck regarding Defendant were not an independently wrongful act proscribed by some constitutional, statutory, regulatory, common law or other determinable legal standard.

    32.    Plaintiff is not liable to Defendant for intentional interference with prospective economic advantage.

06cv371 NLS

**F.    Trade Libel.**

33.   Defendant did not publish a false, factual statement that disparaged the quality of Plaintiff's work.

34.   Plaintiff did not prove that Defendant's statement induced others not to deal with Plaintiff.

35.   Plaintiff did not prove that he suffered special damages due to Defendant's statement.

36.   Plaintiff does not prevail on his claim for trade libel.

37.   Plaintiff published two statements of opinion and one factual statement that was proved neither true nor false, all of which disparaged Defendant or the quality of his work.

38.   Defendant did not prove that Plaintiff's statement induced others not to deal with Defendant.

35.   Defendant did not prove that he suffered special damages due to Plaintiff's statement.

36.   Defendant does not prevail on his counterclaim for trade libel.

**G.    Defamation.**

37.   Plaintiff's statement about Hyper competitiveness is a statement of opinion.

38.   Defendant does not prevail on his counterclaim for defamation.